[No. A031917. First Dist., Div. One. Nov. 10, 1987.]

CITY OF UKIAH, Plaintiff and Appellant, v.
COUNTY OF MENDOCINO, Defendant and Appellant;
FORD GRAVEL COMPANY, INC., Real Party in Interest and
Respondent.

## COUNSEL

David J. Rapport, City Attorney, and Rapport & Martson for Plaintiff and Appellant.

H. Peter Klein, County Counsel, Ronald R. Ball, Chief Deputy County Counsel, and Richard M. Flores, Deputy County Counsel, for Defendant and Appellant.

Derek J. Simmons and Simmons & Wilhelm for Real Party in Interest and Respondent.

## OPINION

**RACANELLI, P. J.**—The question presented in this appeal is whether an environmental impact report (EIR) under the provisions of the California Environmental Quality Act (CEQA) was required before county approval of a reclamation plan submitted by a gravel extracting company. We affirm the judgment for the reasons discussed hereafter.[1]

### FACTS

Since 1946, real party Ford Gravel Company, Inc., (Ford) has been commercially extracting gravel from the Russian River. In 1956, the Mendocino County Board of Supervisors adopted the county's first zoning ordinance. The zoning ordinance classified the unincorporated area where Ford's gravel operations are conducted to require a use permit for "the

---

[1] Following rehearing, we essentially adopt our earlier opinion with some modifications.

establishment of . . . [¶] [c]ommercial excavation of natural materials." (Ord. No. 359, § 3.32.)

In 1964, Ford, which had not previously obtained a use permit for its gravel activities, sought and obtained a use permit for a gravel processing plant. And in 1966, Ford obtained a use permit for a "Redi-mix" batch plant. The permits were issued without conditions or expiration dates.

In 1975, the Legislature enacted the Surface Mining and Reclamation Act (SMARA) regulating surface mining operations. (Pub. Resources Code, § 2710 et seq.)[2] Section 2770 provides that "no person shall conduct surface mining operations unless a permit is obtained from, and a reclamation plan has been submitted to, and approved by, the lead agency for such operation . . . ."

The permit requirement does not apply, however, to an operator "who has obtained a vested right to conduct surface mining operations prior to January 1, 1976 . . . ." As to such operator, all that is necessary is a reclamation plan. (§ 2776.)

In 1979, in compliance with the SMARA requirement that local agencies adopt ordinances regulating surface mining (§ 2774), Mendocino County enacted its own ordinance requiring a reclamation plan and either a permit or a vested right to conduct surface mining operations. (Mendocino County Code [MCC], § 22.16.010 et seq.)[3]

In 1983, in response to a citizen's complaint, the Mendocino County Planning Commission asked Ford Gravel Company to submit a reclamation plan. Ford did so, along with a statement of vested right.

For some unknown reason, the county planning department staff treated Ford's reclamation plan as an application for a use permit authorizing gravel extraction. Accordingly, the planning department undertook an initial study of the environmental effects of the gravel extraction activities and recommended that 21 conditions be imposed upon Ford's "use permit" in order to mitigate environmental effects. The staff also recommended that a "mitigated" negative declaration be adopted. After modification of two of

---

[2] Unless otherwise indicated, all further statutory references are to the Public Resources Code.

[3] We reject Ford's argument that SMARA does not apply to its activities because gravel is perpetually replenished and thus there is no need for reclamation. Although gravel extraction is a unique mining operation, we think Ford's argument should be addressed to the Legislature. As presently drafted, SMARA does encompass gravel extraction as "mining by . . . dredging . . . ." (§ 2735.) And the Mendocino County ordinance expressly includes gravel extraction within its definition of surface mining operations. (MCC, § 22.16.030(N).)

the conditions, the planning commission approved the reclamation plan with the conditions imposed and adopted a negative declaration.

Various water suppliers, including appellant City of Ukiah (City), appealed the planning commission's decision to the county board of supervisors. At this point, however, the planning department staff recommended that an EIR "or equivalent hydrologic study" be prepared.

At the board hearing, the question arose whether CEQA applied since the only matter presented for approval was a reclamation plan, not a use permit. The hearing was eventually continued (two weeks) to allow the planning department to reexamine the status of the issue before the board.

At the continued hearing, the planning director announced that Ford had a vested right to extract the gravel and thus no use permit was necessary. Accordingly, the only issue before the board was whether the reclamation plan should be approved.

Ultimately, the board concluded that in light of the limited issue before it, the board would adopt a negative declaration. The board thereafter approved the reclamation plan subject to certain conditions and biennial review, i.e., November 1985.

City of Ukiah thereupon instituted the underlying mandamus action seeking, inter alia, to compel the county to set aside its approval of Ford's reclamation plan and to mandate submission of an EIR. After extensive argument, the trial court eventually denied the requested relief. The City now appeals from the judgment. The county has also appealed challenging one aspect of the trial court's decision.

DISCUSSION

I.

Background

For years considerable controversy has existed in Mendocino County concerning the extraction of gravel from the Russian River—not only by Ford but by other gravel companies as well. The longstanding controversy was fully ventilated during the board hearings.

Local citizens and a City representative expressed their collective concerns that the Russian River was being "degraded." ("Degradation" is generally understood by the parties to mean simply that the river bottom is lowering.)

It appears that degradation of the river affects local water supplies in the following manner: As the river has dropped, so has the water table which recharges the wells from which water is taken. Moreover, the City obtains some of its water supplies from a "Raney collector," a river well located on the Russian River near Ford's excavation site. The gravel riverbed serves as a natural filter for the water; as the gravel cover is reduced, increased amounts of sediment permeate the water supplies.

The gravel company representatives argued that there is no evidence that gravel extraction is the cause of the falling river. They pointed to other likely causes, including releases of water from the Coyote Valley Dam, increased consumptive uses of river water and the natural forces of the river itself. Indeed, even those opposing Ford's reclamation plan conceded that the principal cause of the river degradation is unknown. In fact, streambed degradation is occurring throughout the river system, including areas with little or no gravel extraction operations.

It was repeatedly suggested to the board that a broad-based study of the entire watershed area was necessary in order to determine the true causes of the river dynamics. It was also emphasized that it would be unfair to require Ford alone to finance the study (EIR) in view of the fact that the scope of the problem transcends Ford's gravel skimming.

The board was informed that *if* evidence was produced that Ford's activities were harming the river, then the board could take appropriate action including revocation of Ford's use permits and initiation of suit for injunctive relief or damages for maintaining a public nuisance. It was also noted that other relevant agencies, such as the Department of Fish and Game, Regional Water Resources Control Board, Army Corps of Engineers and County Air Pollution Control District, could likewise revoke permits issued to Ford.

## II.

### The Negative Declaration

Although the CEQA mandates that public agencies obtain an EIR before approval of a project (§§ 21002.1, 21151), none is required where the agency finds the project will not have a significant effect on the environment (§ 21151). In such case, the agency merely adopts a negative declaration to that effect. (§ 21080, subd. (c).) ■ A negative declaration is inappropriate, however, and an EIR is required whenever "it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66].)

 City vigorously challenges the board's decision to adopt a negative declaration contending that a fair argument *was* presented to the board that Ford's activities are degrading the river.

The record reflects that the board heard considerable evidence concerning degradation of Russian River. The principal witness, Ted Goforth, the City deputy director of public works, conceded he did not know the cause of the degradation. In response to a question by a board member whether the increased flow of water released from Coyote Valley Dam was the operative cause, Mr. Goforth candidly replied: "I think at this point anything's a possibility. I cannot tell you. I don't know. I don't know that anyone in this room can tell you for a fact what's causing it. Probably a combination of factors, yes."

Moreover, Ford's written reclamation plan and other testimony revealed that Ford extracts gravel on a "sustained yield basis": it removes only the amount which has been redeposited by the winter runoff. And the county planning department staff noted that: "As long as the amount of gravel being removed did not exceed the amount of gravel recruited each year, no significant impacts upon the resource base would occur."

Several witnesses theorized that the degradation was due to other forces. The most frequently mentioned cause was the timing and quantity of water released from the Coyote Valley Dam. But natural forces (such as winter storms) and increased consumption were also viewed as probable causes.

In rejecting City's argument, the trial court concluded that there was no credible evidence of "any nexus between the drop in the river and the reclamation plan of Ford." City argues, however, that both the board and the trial court failed to consider the cumulative impact of Ford's gravel extraction activities in combination with other gravel mining operations on the river.

In view of CEQA's requirement of an analysis of the cumulative effects of a project (Cal. Admin. Code, tit. 14 [hereafter Guidelines], § 15065, subd. (c)), the argument would be persuasive if the "project" under review by the board had been Ford's gravel operations. But the argument is flawed since Ford's gravel operations were *not* before the board in the now challenged proceedings. Rather, the only item subject to approval was Ford's reclamation plan.

The determination which must be made by a public agency in deciding whether to require an EIR or to adopt a negative declaration is whether *the project being approved* may have a significant effect on the environment. (§ 21151.) A "project" is defined to mean private activities "involving the

issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (§ 21065; see also Guidelines, §§ 15377, 15378, subds. (a)(3), (c).)

Considerable confusion reigned at the board hearing as to the nature of the project then under review. Initially, the board—undoubtedly influenced by the planning department's original treatment of the reclamation plan as a permit application—assumed that the project was Ford's long-existing gravel extraction activities. Eventually, the board realized that the only project before it was Ford's reclamation plan. We think the board's ultimate conclusion was correct.

Ford's underlying activity was, of course, its extraction of gravel from the Russian River. But that activity did not require a license, permit or other authorization in view of the board's acceptance of its planning director's determination that Ford already possessed a vested right or authority to extract gravel. (See discussion in Part III, *infra*.) Thus, the only matter presented for board approval was Ford's reclamation plan. Consequently, any environmental inquiry was limited to whether *that* project would have a significant environmental impact.[4]

Ford's plan did not call for any external activities for purposes of reclamation of the streambeds. Instead, Ford relied upon the replenishment of the gravel beds by natural gravel movement during the winter high flows. In approving Ford's reclamation plan, the board imposed 11 conditions requiring Ford to provide detailed information relating to the process of natural reclamation. Additionally, Ford was required to provide photographs and "cross-sections" of the gravel bar before commencing its operations each year and again following its operations but before the winter rains. And Ford was also required to submit reports of the actual quantities of gravel removed. In essence, the current activities called for by Ford's reclamation plan consisted of collection of data and its submission to the planning department. Under these circumstances, we think the board could reasonably find that such information-gathering activities could have no significant environmental effects.[5]

Indeed, projects deemed categorically exempt from CEQA due to lack of a significant environmental effect (§ 21084) include "basic data collection,

---

[4] We reject Ford's argument that CEQA is entirely inapplicable. We agree with the City that a reclamation plan is an "entitlement for use" inasmuch as the SMARA prohibits surface mining operations unless a reclamation plan has been submitted and approved. (§ 2770.) Thus, a reclamation plan is a "project" under CEQA. What the City overlooks, however, is that the "project" was the reclamation plan, not the gravel extraction operations.

[5] We express no opinion whether under different circumstances a reclamation plan which did call for reclamation activities might have a significant environmental impact.

research, experimental management, and resource evaluation activities which do not result in a serious or major disturbance to an environmental resource." (Guidelines, § 15306.) Ford's reclamation plan appears to fall within that specified exemption. Though cognizant of the exemption status, the board elected to forego a categorical declaration which would have required it to issue a notice of exemption (see Guidelines, § 15065) and, instead, decided to simply find that the project had no significant environmental effects. That factual determination is adequately supported by the record before us. There is no evidence of any significant environmental impact resulting from Ford's *reclamation plan.*

It bears repetition that the crucial consideration herein was the limited nature of the proceeding: whether Ford's reclamation plan should be approved. However, the board also recognized that if evidence were later developed that gravel extraction activities were contributing to the river degradation, the county could undertake appropriate administrative or other remedial actions. As a result of the virtually unanimous view of the participants that the degradation problem was one of much broader scope, the board ultimately decided to reconvene a gravel committee to study gravel erosion problems on the Russian River.

There is no reason to believe that the board or other pertinent agencies will fail to take such action as is reasonably necessary to protect the Russian River and to preserve its delicate ecosystem. Should the board or other relevant public agency fail to faithfully discharge its official responsibilities in that regard, then, of course, the City or other interested party could seek appropriate judicial relief.[6] The present proceeding was simply an improper forum to address the larger issues dealing with the problem of degradation of the Russian River in general.

### III.

### The Use Permit

City challenges the board's premise that Ford had a vested right to engage in gravel mining on the river. City argues that Ford was required to obtain a use permit for its *gravel mining activities,* and that it was those activities which constituted the "project" subject to approval.

City relies on sections 34.01 and 34.06 of the 1956 zoning ordinance pertaining to nonconforming uses.[7] City argues that Ford's gravel opera-

---

[6] It is noteworthy that the City voluntarily dismissed two of its causes of action seeking to compel the county to undertake a broad assessment of the river and to monitor the effects of all the gravel extractions.

[7] Section 34.01 provides: "The lawful use of land existing at the time of the passage of this Ordinance, although such use does not conform to the provisions hereof, may be continued,

tions come within the five-year phase-out period for nonconforming "business and industrial" uses under section 34.01 and thus, pursuant to section 34.06, Ford was required to obtain a use permit after 1961. We remain unconvinced.

First, we do not think Ford can be compelled to obtain a use permit to continue its preexisting gravel mining operations. ■ A property owner has a vested right to continue *lawful* uses of property and is not required to obtain a special use permit in order to continue lawful preexisting uses. (*McCaslin* v. *City of Monterey Park* (1958) 163 Cal.App.2d 339, 348-349 [329 P.2d 522]; see 66 Cal.Jur.3d, Zoning and Other Land Controls, § 110, pp. 422-424; 2 Ogden's Revised Cal. Real Property Law (Cont.Ed.Bar 1975) § 24.14, p. 1188.)[8]

■ Nor do we believe that Ford's existing gravel operations were nonconforming uses. ■ A nonconforming use is one which lawfully existed prior to the effective date of the zoning restriction and which continued thereafter in nonconformity with the ordinance.[9] (See *City of Los Angeles* v. *Gage* (1954) 127 Cal.App.2d 442, 453 [274 P.2d 34]; see also 66 Cal.Jur.3d, *supra,* Zoning and Other Land Controls, § 1, p. 142.) ■ Here, Ford's existing gravel operations did *not* violate the zoning ordinance. Under section 3.32 of the zoning ordinance, all lawful uses were permitted within A-1 districts as a matter of right. Only *new* activities—"the *establishment* of . . . Commercial excavation of natural materials"—required a use permit.[10] When Ford established a new gravel processing plant in 1964 and a new Redi-mix plant in 1966, it applied for and obtained the necessary use permits. (Cf. *Paramount Rock Co.* v. *County of San Diego* (1960) 180 Cal.App.2d 217, 225-230 [4 Cal.Rptr. 317] [property owner authorized to

provided however that non-conforming business and industrial uses being operated on open land may be continued for a period not longer than five (5) years after this Ordinance becomes effective. . . ."

Section 34.06 provides: "The owners or occupant of any land or building classified as a non-conforming use under the provisions of this Ordinance shall, upon notification by the Planning Commission, make application for a use and occupancy permit, and shall annually thereafter apply for renewal of said permit."

[8] Of course, if the use is shown to be a danger to the public health, safety or general welfare, the county may by zoning ordinance prohibit continuation of the offending activities. (*Consolidated Rock Products Co.* v. *City of Los Angeles* (1962) 57 Cal.2d 515 [20 Cal.Rptr 638, 370 P.2d 342], app. dism. (1962) 371 U.S. 36 [9 L.Ed.2d 112, 83 S.Ct. 145].)

[9] Section 6.37 of the 1956 zoning ordinance defines "non-conforming use" as follows: "A use which lawfully occupied a building or structue [*sic*] or was conducted upon open land prior to the effective date of the use regulations in the district in which it is located and with which regulations it does not comply."

[10] Section 3.32 of the zoning ordinance (governing "A-1" districts) provides as follows: "(a) All uses not otherwise prohibited by law are permitted, except that the establishment of any of the following shall not be permitted unless and until a use permit shall first have been secured in each case. [¶] 2. Commercial excavation of natural materials. . . ."

continue extracting sand and preparing ready-mix cement but not to operate new rock crushing plant].) But of paramount significance, Ford's in-stream gravel mining operations, which predated the 1956 zoning ordinance, were permitted as a matter of right and did not require a use permit.[11] Thus, throughout the proceedings below, Ford possessed a vested right to continue its existing gravel operations and was not subject to a use permit requirement for that purpose.[12]

## IV.

### The Reclamation Plan

■ Finally, City argues that Ford's reclamation plan is incomplete and inadequate and should have been rejected by the board. The argument is equally unconvincing.

The SMARA sets forth the required contents of a reclamation plan, including, "[a] description of the manner in which reclamation, adequate for the proposed use or potential uses will be accomplished, including: . . . (2) a description of the manner in which rehabilitation of affected streambed channels and streambanks to a condition minimizing erosion and sedimentation will occur." (§ 2772, subd. (h).) The county ordinance is framed in similar language. (MCC, § 22.16.042(H).)

Ford's plan, as submitted, is sketchy at best. Presumably, Ford's intention to continue indefinitely its gravel extraction activities motivated its brief reply to the form inquiry to "[d]escribe the methods, their sequence and timing, to be used in bringing the reclamation of land to its end state." Although the preprinted form specifically asked for a discussion of nine items, including "Treatment of streambeds and stream banks to control erosion and sedimentation," Ford tersely responded: "All of the above are carefully controlled to insure continued Long term operation. [¶] This operation will continue thru the foreseeable future as a major supplier of materials for construction in the Ukiah area." (Spelling from the original.)

[11] City's purported reliance on section 31.05 of the 1956 zoning ordinance is also misplaced. The section provides in part: "The following accessory uses, in addition to those hereinbefore mentioned shall be permitted. . . . [¶] (d) Airports and the commercial excavation of natural materials may be permitted in any district upon the securing of use permits in each case."

But this provision applies to accessory uses only and has no relevance to Ford's activities. An "accessory use" is defined by section 6.03 of the ordinance as "A use or building incidental or subordinate to the principal use or building located upon the same lot."

[12] Parenthetically, we reject the interpretation of section 34.06 by both Ford and the county that a use permit is required only "upon notification by the Planning Commission." Such construction arguably would grant unfettered discretion to the planning commission to determine whether a use permit was necessary, a result in open conflict with settled principles that a landowner has a vested right to continue an otherwise lawful preexisting use without the necessity of a use permit.

City argues that Ford's plan fails to provide any substantive description of the manner or method whereby the natural streambeds would be restored. We disagree.

Ford's reclamation plan clearly relies upon the natural movement of gravel during the high water winter flows to replenish the riverbed. The county planning staff recognized that Ford's reclamation activities were "limited to smoothing and sloping the bar as required by the Department of Fish and Game with the rest of the reclamation left to the natural stream processes of gravel movement during winter high flows." And it must also be recognized that in approving the plan, the board imposed 11 conditions requiring Ford to submit detailed data factually demonstrating that the gravel source is sufficiently replenished each year. When those conditions are read into the plan, Ford's plan seems adequate to ensure that the county will be able to effectively monitor and review any adverse effects brought about by Ford's gravel removal operations.[13]

The judgment is affirmed.

Elkington, J., and Holmdahl, J., concurred.

The petition of plaintiff and appellant for review by the Supreme Court was denied February 25, 1988. Mosk, J., was of the opinion that the petition should be granted.

---

[13] We note that one of the conditions imposed upon Ford's reclamation plan requires the Department of Fish and Game to notify the county should the department find the gravel replenishment "inadequate." In such event, the county (acting through its planning and building services departments) must "limit" or "halt" Ford's extraction for the season.