[No. F019841. Fifth Dist. Aug. 12, 1994.]

SAN JOAQUIN RAPTOR/WILDLIFE RESCUE CENTER et al., Plaintiffs and Appellants, v.
COUNTY OF STANISLAUS et al., Defendants and Respondents;
ARAMBEL AND ROSE DEVELOPMENT, INC., Real Party Interest and Respondent.

716

**COUNSEL**

Roger Beers and Kathryn Lodato for Plaintiffs and Appellants.

Michael H. Krausnick, County Counsel, and E. Vernon Seeley, Assistant County Counsel, for Defendants and Respondents.

Washburn, Briscoe & McCarthy, Sandi L. Nichols and Anne E. Mudge for Real Party in Interest and Respondent.

OPINION

BUCKLEY, J.—Appellants San Joaquin Raptor/Wildlife Rescue Center and John Mataka appeal from the judgment entered denying their complaint and petition for writ of mandate challenging the approval by respondent County of Stanislaus (County) of a proposal by respondent Arambel and Rose Development, Inc. (Arambel), to build a residential development near the existing community of Grayson, California. Appellants contend the environmental impact report (EIR) prepared in connection with the project did not comply with the California Environmental Quality Act (CEQA).

We will reverse. In so doing, we ratify the long-acknowledged purpose of an EIR, and the roles of a county board of supervisors and a reviewing court relative to CEQA. The purpose of an EIR is to provide enough information about a project so that the board of supervisors can make an informed decision thereon. Our role here, as a reviewing court, is not to decide whether the board acted wisely or unwisely, but simply to determine whether the EIR contained sufficient information about a proposed project, the site and surrounding area and the projected environmental impacts arising as a result of the proposed project or activity to allow for an informed decision by the County Board of Supervisors (Board). (Cf. *Marin Mun. Water Dist.* v. *KG Land California Corp.* (1991) 235 Cal.App.3d 1652, 1666 [1 Cal.Rptr.2d 767].) As we shall explain, in this case, it did not.

## STATEMENT OF FACTS

In June of 1989, Arambel applied for an amendment of the general plan, rezoning and approval of a tentative parcel map to permit construction of "Grayson Park Unit 3," a residential development consisting of 633 single-family homes, a commercial area and a park (the development project). A small "District Office Building and Meeting Hall for the Grayson Community Service District" was later added. The development project is proposed to be located on 154.24 acres contained within the County, north of the unincorporated community of Grayson (site). "[T]he site is strategically located to serve Bay Area commuters."

The development project was originally circulated as a mitigated negative declaration. The County was designated lead agency. After preparation and review of an expanded initial study, the County required preparation of an EIR. On December 8, 1989, the County published notice of preparation of an EIR.

A draft EIR was completed and circulated for comment (DEIR). On September 6, 1990, the County Planning Commission (Commission) held a public hearing to "solicit comments on the draft EIR."

The final EIR was completed in October 1990 (FEIR). The FEIR consists of the DEIR, written comments to the DEIR and responses to these written comments. The content of the FEIR will be discussed as necessary in the body of this opinion.

The Commission prepared a staff report dated November 29, 1990, addressing Arambel's application. In relevant part, the staff report recommended the development project be approved, the FEIR be certified as "complete and adequate under CEQA," a "finding of overriding considerations to the unmitigated impacts of the project" on air quality and conversion of agricultural land be made and that it be found that "there is evidence on the record to support the required general plan findings and approve the general plan change" and rezoning.

The Commission held "a duly advertised public hearing on November 29, 1990." After comments were received, the Commission voted to follow the recommendations contained in the staff report.

On December 11, 1990, the Board held a public hearing on the development project. After "hearing testimony regarding this application," the Board approved the recommendations and findings as set forth in the staff report, voted in favor of the tentative map approval, general plan amendment and rezoning and directed counsel to prepare appropriate findings.

On December 18, 1990, the Board issued its findings of fact and statement of decision. In relevant part, the Board made 15 findings, which will be discussed as necessary in the body of this opinion. The Board approved the development project subject to the mitigation measures included in the findings. It certified the FEIR as "complete and adequate," adopted a statement of overriding considerations for the unavoidable environmental impacts of the project, and approved an amendment of the general plan, rezone application and tentative subdivision map. Notice of determination was filed December 19, 1990.[1]

Appellants filed a petition and complaint on January 18, 1991. Demurrers to the complaint were sustained without leave to amend by the trial court. On appeal, this court reversed.

Appellants filed a second amended complaint and petition for writ of mandate. Appellants alleged the FEIR violated CEQA for many reasons,

---

[1]The Board approved the development project despite the FEIR's conclusion that "[t]he project will not pay for all the urban services it requires from the County. At full build-out, the project will have a negative cash flow to the County of $95,464 in 1989 dollars, . . . assuming the costs remain constant with increasing property values . . . ."

including an inadequate project description, inaccurate description of the site and the surrounding area, inadequate evaluation of project impacts, inadequate analysis of alternatives and inadequate response to comments on the DEIR. Appellants also alleged approval of the development project was inconsistent with the County's general plan. On March 5, 1993, the trial court filed a tentative decision denying the writ and the complaint. Judgment was thereafter entered. This appeal followed.

## Discussion

### Overview of CEQA and Standard of Review

CEQA (Pub. Resources Code, § 21000 et seq. and Cal. Code Regs., tit. 14, § 15000 et seq.[2]) was enacted in 1970, one year after Congress enacted the National Environmental Policy Act (42 U.S.C. 4321 et seq.). (Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (7th ed. 1993) p. 1 (hereafter Guide to CEQA).) "CEQA applies to all 'governmental agencies at all levels' in California, including 'local agencies,' 'regional agencies,' and 'state agencies, boards, and commissions.'" (*Id.* at p. 2.) In its seminal case, *Laurel Heights, supra*, 47 Cal.3d 376, the Supreme Court provided a concise overview of CEQA:

"The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' . . .

"With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. [Citations.] 'Project' means, among other things, '[a]ctivities directly undertaken by any public agency.' [Citation.] '"Significant effect on the environment" means a substantial, or potentially substantial, adverse change in the environment.' [Citations.] The Legislature has made clear that an EIR is 'an informational document' and that '[t]he purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citations.]

---

[2]California Code of Regulations, title 14, section 15000 et seq. is cited as the "State CEQA Guidelines." (State CEQA Guidelines, § 15001.) These Guidelines are binding on all public agencies in California. (State CEQA Guidelines, § 15000; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278] (hereafter *Laurel Heights*).)

"Under CEQA, the public is notified that a draft EIR is being prepared [citations], and the draft EIR is evaluated in light of comments received. [Citations.] The lead agency then prepares a final EIR incorporating comments on the draft EIR and the agency's responses to significant environmental points raised in the review process. [Citations.] The lead agency must certify that the final EIR has been completed in compliance with CEQA and that the information in the final EIR was considered by the agency before approving the project. [Citation.] Before approving the project, the agency must also find either that the project's significant environmental effects identified in the EIR have been avoided or mitigated, or that unmitigated effects are outweighed by the project's benefits." (47 Cal.3d at pp. 390-391, fns. omitted.) The court continued, explaining the important purposes served by preparation of an EIR: "The EIR is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.] The EIR is therefore 'the heart of CEQA.' [Citations.] An EIR is an 'environmental "alarm bell" whose purpose is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' [Citations.] The EIR is also intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' [Citations.] Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] *The EIR process protects not only the environment but also informed self government.*" (47 Cal.3d at p. 392, italics added.)

Public Resources Code section 21168.5 sets forth the applicable standard of review. (*People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 840 [115 Cal.Rptr. 67]; see also *Laurel Heights, supra,* 47 Cal.3d at p. 392, fn. 5). It provides: "In any action . . . to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with [CEQA], the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

"[T]he ultimate decision of whether to approve a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decision-makers, and the public, with the information about the

project that is required by CEQA." (*Santiago County Water Dist.* v. *County of Orange* (1981) 118 Cal.App.3d 818, 829 [173 Cal.Rptr. 602].) The error is prejudicial "if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." (*Kings County Farm Bureau* v. *City of Hanford* (1990) 221 Cal.App.3d 692, 712 [270 Cal.Rptr. 650].)

■ "[T]he substantial evidence test applies to the court's review of the agency's factual determinations." (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 1993) § 23.34, p. 949 (hereafter Practice Under CEQA).) Substantial evidence means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (State CEQA Guidelines, § 15384, subd. (a); see also *Laurel Heights, supra,* 47 Cal.3d at p. 393.) "In applying the substantial evidence standard, 'the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision.'" (47 Cal.3d at p. 393.) The appellate court's role "is precisely the same as the trial court's," and lower court's findings are not "conclusive on appeal." (*Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065, 1076 [230 Cal.Rptr. 413].)

1. *The FEIR did not comply with CEQA.*

    a. *Environmental setting.*

■ Appellants challenge the adequacy of the FEIR's description of the existing environmental setting of site and the surrounding area, contending a nearby wildlife preserve was essentially ignored, and it is impossible to determine from the FEIR whether wetlands exist on the site. We agree. They persuasively argue that the inadequate consideration and documentation in the EIR of existing environmental conditions rendered it "impossible for the [FEIR] to accurately assess the impacts the project will have on wildlife and wildlife habitat or to determine appropriate mitigation measures for those impacts."

In relevant part, State CEQA Guidelines section 15125 provides as follows:

"An EIR must include a description of the environment in the vicinity of the project, as it exists before the commencement of the project, from both a local and regional perspective. The description shall be no longer than is necessary to an understanding of the significant effects of the proposed project and its alternatives.

"(a) Knowledge of the regional setting is critical to the assessment of environmental impacts. Special emphasis should be placed on environmental resources that are rare or unique to that region and would be affected by the project." The Guide to CEQA explains the significance of adequate consideration of the existing environmental setting: "Because the concept of a significant effect on the environment focuses on changes in the environment, this section requires an EIR to describe the environmental setting of the project so that the changes can be seen in context. The description of the pre-existing environment also helps reviewers to check the Lead Agency's identification of significant effects." (Guide to CEQA, *supra*, p. 579.)

"We must interpret the Guidelines to afford the fullest possible protection to the environment." (*Kings County Farm Bureau* v. *City of Hanford, supra*, 221 Cal.App.3d at p. 720.) Careful review of the administrative record demonstrates that the FEIR's description and consideration of the site and surrounding area is so incomplete and misleading that it fails to meet the standard set forth in State CEQA Guidelines section 15125.[3]

In the section of the DEIR labeled "Project Information — Site Description," under the heading "Land Use," the DEIR asserts: "The project site is largely an agricultural parcel in row crops and rural residential housing." Under the heading entitled "Terrain," the DEIR states, in relevant part: "The proposed project area is located on the 40-foot westbank terrace of the San Joaquin River floodplain. On the northeast, the site extends along the 40-foot river terrace, locally continuing the stable, elevated 'west side' landform. The easterly border of the project site is delineated by the San Joaquin River floodplain at 35 feet elevation; a small, triangular-shaped portion of which is designated for development as a park. The park area and residential development area are generally separated by a five foot drop in elevation. This bluff gradually drops down to grade level at the proposed park site." Within the section addressing the effects of the development project on vegetation and wildlife, the DEIR states that the site "is agricultural lands bordered on all sides by established agricultural uses."

The heading entitled, "Character of Surrounding Area" reads in its entirety: "The project area has historically been in agricultural use. To the

---

[3]There appears to be no published California authority specifically addressing the adequacy of an EIR's discussion of the environmental setting other than a line of authority commencing with *Environmental Planning & Information Council* v. *County of El Dorado* (1982) 131 Cal.App.3d 350, 354 [182 Cal.Rptr. 317], which held that an EIR must compare the impacts of a project with "the actual environment upon which the proposal will operate" and not with the existing general plan. (See 1 Practice Under CEQA, *supra*, § 12.26, p. 485; Guide to CEQA, *supra*, at pp. 190-191.) Research also revealed no applicable federal authority.

southwest, west and northwest of the project site the land is in row crops, primarily tomatoes. The northerly boundary is adjacent to a sewage treatment facility. The easterly boundary of the project site is an approximately four foot high levee which is bounded on the north by San Joaquin River, and on the south by the proposed park site. Adjacent to the easterly boundary is bottom land disced for row crops. The southerly boundary consists of the Grayson Park Two development. Further south is the Grayson Park One development and the unincorporated community of Grayson. An almond orchard is located south of the intersection of Minnie Street and River Road (see Figure 8, Existing Land Uses)."

The descriptions quoted above lead one to conclude the site and the surrounding area is rather nondescript farmland, mostly in agricultural production. However, this characterization is inaccurate and misleading. In actuality, it appears the site is only partially surrounded by farmland. The park site is adjacent to the San Joaquin River, a wildlife preserve is located nearby and wetlands may be located within the site itself.

The record contains documentation supporting the conclusion that wetlands are important wildlife habitats. As stated in a report prepared by the United States Department of Interior, entitled Wetlands of the California Central Valley: Status and Trends—1939 to mid-1980's—(1989) chapter 7: "Wildlife habitat, particularly for waterfowl, is often the major focus for wetland values. However, the Central Valley wetlands offer a myriad of other important functions. These include aesthetic, scientific, and educational interests; primary productivity in the food chain; fish habitat; endangered and threatened wildlife species habitat; shoreline and bank stabilization and protection; flood protection; groundwater recharge; and recreation opportunities."

An additional report, Sliding Toward Extinction: The State of California's Natural Heritage (1987) prepared at the request of the California Senate Committee on Natural Resources and Wildlife (Nov. 1987) explains that by 1978, "wetlands in the Central Valley had shrunk to only about 4 percent of their original extent [citation], and they have declined since then." (At p. 60.) Over 50 percent of the total wintering waterfowl in the Pacific flyway utilize these wetland areas as their habitat. The decrease in wetland areas has led to a decline in the population of waterfowl. "The declines in waterfowl and other wetland wildlife populations not only represent recreational losses to those who hunt and view these species, but also pose a long-term population threat to many species or subspecies that winter mainly or only in California." (Ibid.) The report further states that the protection of existing

wetlands may require restriction of other land uses because "wetlands are particularly susceptible to adjacent land uses that alter surface and ground-water availability." (At p. 65.) Neither of these reports specifically addresses whether wetlands are located within the site.

Despite the environmental importance and sensitivity of wetland areas, the DEIR completely fails to mention and consider a nearby wetland wildlife preserve, San Joaquin Wetlands Farm (SJWF), located adjacent to the San Joaquin River opposite the town of Grayson and the proposed project. Only by reading a written comment by Neal Nelson, managing partner of SJWF, does one learn of this wetland area's existence. Nelson writes that this land is designated as "wetlands and farmed wetlands. Our main purpose for this property is for the preservation of waterfowl, wildlife and fish. All other uses on the property are secondary and subject to its effects on waterfowl, wildlife and fish."

The response to Nelson's comment is insufficient; it is not responsive to the concerns raised by Nelson and fails to provide adequate information concerning SJWF or other nearby riparian habitats or wildlife preserves from which a reader could derive an understanding of their locations and the environmental effects they may suffer as a result of construction of the development project. First, while not denying SJWF is across the river from the site, the response simply asserts that an EIR is required only to identify adjacent uses and not property owners. A wildlife preserve is certainly a property "use." No further description of SJWF, its size or location is contained in the response to this comment or elsewhere in the FEIR. Second, the response fails to address the concerns raised by Nelson. For example, Nelson states that the DEIR fails to address the cumulative effects on SJWF and "the eventual degradation and destruction of the marsh" which will be caused by activities such as mosquito abatement necessitated by an influx of population "next to a marsh." The response does not address this assertion; rather, it simply states that "the Turlock Mosquito Abatement District indicated that provision of the service to the site would be difficult." It did not address what effects the call for mosquito control and other measures necessitated by development of the site would have on SJWF.

The FEIR also understates the significance of the San Joaquin River located directly adjacent to the site. By avoiding discussion of the San Joaquin River and identification of SJWF, the DEIR precluded serious inquiry into or consideration of wetland areas adjacent to the site or whether the site contained wetland areas. These deficiencies were not remedied by the comments and responses thereto contained in the FEIR.

Also crucial is the fact that the DEIR's description of the area surrounding the development project site as agricultural lands is misleading. It is obvious from a careful reading of the administrative record that not only is SJWF located nearby, but the proposed park site is directly adjacent to a wetland area/riparian habitat.[4] There are several unexplained references in the DEIR to a "riparian area" or "adjacent riparian corridor" next to the park site. Moreover, the DEIR notes there is to be "a 200 foot open space buffer to the riparian area." Contradicting the DEIR's description of the surrounding area as agricultural, in response to a comment, the FEIR admits that the site is "situated in a region of extensive agriculture, riparian, marsh and other wetland habitats significantly used by resident, wintering and migratory waterfowl." However, the specific location and extent of the adjacent "riparian habitat" is never discussed in the FEIR.

Of central importance to this discussion is our determination that whether the site itself contains wetlands was inadequately investigated.[5] State CEQA Guidelines section 15144 provides: "[d]rafting an EIR or preparing a negative declaration necessarily involves some degree of forecasting. While foreseeing the unforeseeable is not possible, an agency must use its best efforts to *find out* and disclose all that it reasonably can." (Italics added.) CEQA Guidelines section 15145 states: "If, *after thorough investigation*, a lead agency finds that a particular impact is too speculative for evaluation, the agency should note its conclusion and terminate discussion of the impact." (Italics added.)

Prior to preparation of the DEIR, the County was alerted to the possibility wetlands may exist *within* the site. The initial study stated: "There may be a

---

[4]In its petition for rehearing Arambel asserts that there exists a significant difference between "wetlands" and "riparian areas" and that this distinction is legally significant here. We are most certainly aware of the differences between these two ecologically sensitive habitats. The term "wetlands" refers to " 'those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas.' " (*Avoyelles Sportsmen's League, Inc.* v. *Marsh* (5th Cir. 1982) 715 F.2d 897, 911, quoting 33 C.F.R. § 323.2(c) (1982); now see 33 C.F.R. § 328.3(b) (1993).) A riparian area is understood to mean "of, adjacent to, or living on, the bank of a river or, sometimes, of a lake, pond, etc." (Webster's New World Dict. (2d college ed. 1982) p. 1228.) However, the technical differences between the two habitats are without legal import here and do not affect our resolution of the issues presented. Therefore, we have chosen to include both types of habitats under the rubric of "wetlands."

[5]While it was asserted during the hearing on the adoption of the FEIR that "two separate biological firms evaluate[d] the project" and the lack of wetlands on the site was verified by "independent investigation," the administrative record contains no documentary record of this alleged investigation into the existence and location of wetlands.

decrease in the number of species and amount of existing native vegetation due to development of the proposed park site. *Depending upon the design of the proposed park, much of this wetland area could experience the loss of existing trees.*" (Italics added.)

The DEIR did not seriously address this issue. There is no reference to wetlands or the lack thereof in the description of the site. Rather, buried in the section addressing the cumulative impacts of the project, under the heading, "VEGETATION AND WILDLIFE," the DEIR makes the conclusionary statement, "No wetlands occur within the site and the riparian areas have been set aside." No discussion accompanies this crucial assertion; there is no indication how this conclusion was reached and no facts are given in support thereof. There is no indication in the FEIR that the park area or bluffs at the east edge of the site were ever surveyed for wetland areas. The FEIR references no documents or reports describing the location and extent of wetlands adjacent to the bluff or park area of the site.

During circulation of the DEIR, this issue was raised again. On December 9, 1990, Bob Ford, a biologist, wrote, "[t]he 200-ft. 'buffer' is inadequate as riparian habitat *extends well beyond* that in the 'park area' and extends northward along the low bluff at the east edge of the project." No response to this letter is included in the FEIR or administrative record.

Arambel asserts the lack of wetlands within the site was adequately addressed during the public hearing on the FEIR. It is mistaken. Whatever is required to be considered in an EIR must be in the report itself. Oral reports cannot supply what is lacking. (*Santiago County Water Dist.* v. *County of Orange, supra,* 118 Cal.App.3d at p. 831.) Moreover, if the alleged investigation into the existence of wetlands was conducted as asserted at the public hearing, this investigation should have been documented in the DEIR and reference made to the specific activities undertaken and findings reached to support the crucial assertion that wetlands are not located within the site. Comments could have then been made addressing the adequacy of the investigation and responses prepared to these comments. The FEIR would then have provided information sufficient for the Board to intelligently assess the conclusion that there are no wetlands within the site and to make an informed decision.

Arambel's assertion that the comments to the DEIR from the California Department of Fish and Game and Department of Conservation demonstrate there are no wetlands within the site is also without merit. First, the comments from the Department of Fish and Game do not definitively state

there are no wetlands within the site. In fact, the August 30, 1989, letter from Lawrence Silva, an "environmental analysist," to the Department of Fish and Game, indicates wetland habitat values may be lost as a result of construction of the project. He writes that replacement of riparian trees within the park site and the "possibility of re-creation of wetland habitat in the storm drainage basin area should help to offset any potential loss of existing wetland values," thereby indicating the park contains wetland/riparian values. The response to Mr. Silva's letter from the Department of Fish and Game does not indicate any independent investigation was conducted by the department to determine whether riparian habitats extend within the site. Second, the Department of Conservation is "responsible for monitoring farmland conversion," and not for protection of wetland areas. Therefore, the fact their comment does not refer to wetland habitats does not demonstrate the site does not contain such areas.

Finally, the initial study states that it is the Army Corps of Engineers which has jurisdiction over wetlands adjacent to waters of the United States. While the California Department of Fish and Game "exercises an advisory capacity" to the agency, it is only in relation to the "alteration of streambeds and other wetlands." There is no indication in the record that the Department of Fish and Game is responsible for locating wetlands or advising on projects which negatively affect wetland areas in ways other than direct alteration. The initial study also states that "regional water quality control boards have asserted a claim to regulate development of wetlands in some areas," and development of the proposed park site "may necessitate the involvement of one or more of these agencies." Comments to the DEIR from the Army Corps of Engineers or water quality control boards pertaining to the possible existence of wetlands within the site are noticeably absent from the FEIR.

It is true that the lead agency is not required to conduct all suggested testing or experimentation. (*Society for California Archaeology* v. *County of Butte* (1977) 65 Cal.App.3d 832, 838-839 [135 Cal.Rptr. 679].) However, the FEIR does not reflect even minimal investigation into the exact location and extent of riparian habitats either adjacent to or within the site. If an investigation specifically considering the presence and extent of wetland areas adjacent to and within the site was conducted and the results demonstrated there were no wetlands within the site, this should have been fully explained in the FEIR. The investigators should have been identified, the actions taken by them disclosed and their conclusions supported by facts and analysis. (Cf. *Laurel Heights, supra,* 47 Cal.3d at p. 410; *Marin Mun. Water Dist.* v. *KG Land California Corp., supra,* 235 Cal.App.3d 1652, 1662-1663.)

For the reasons set forth above, the description of the environmental setting of the project site and surrounding area is inaccurate, incomplete and misleading; it does not comply with State CEQA Guidelines section 15125.

Without accurate and complete information pertaining to the setting of the project and surrounding uses, it cannot be found that the FEIR adequately investigated and discussed the environmental impacts of the development project. The failure to provide clear and definite analysis of the location, extent and character of wetlands possibly within and definitely adjacent to the development project and the failure to discuss SJWF, precludes this court from concluding that all the environmental impacts of the development project were identified and analyzed in the FEIR.

For example, since wetland areas and wildlife refuges such as SJWF were not adequately identified and described, the FEIR's analysis of the development project's impacts on the Pacific flyway and local flyways is clearly inadequate. The waterfowl being considered rely upon the inadequately identified and described riparian habitats. Without an understanding of the proximity of these habitats to the site, one cannot adequately assess the impacts the development project will have on the waterfowl residing in these ecologically sensitive areas or critically analyze the FEIR's conclusions concerning these impacts and the sufficiency of proposed mitigation measures.

Thus, the description of the environmental setting is not only inadequate as a matter of law but it also renders the identification of environmental impacts legally inadequate and precludes a determination that substantial evidence supports the Board's finding that the environmental impacts on wildlife and vegetation had been mitigated to insignificance.[6] As stated in *Kings County Farm Bureau* v. *City of Hanford, supra,* 221 Cal.App.3d at page 718, "The misleading nature of the discussion and the failure to include relevant evidence . . . renders the EIR inadequate as an informational document."

b. *Project description.*

Appellants also find fault with the FEIR by its omission of reference to the wastewater treatment plant (sewer expansion) as a necessary element of the development project. Again, we agree. Sewer expansion was recognized by the DEIR as necessary to the project, yet was excluded from the

---

[6]Because the existence of wetlands/riparian habitats within and/or adjacent to the site were inadequately identified and addressed in the FEIR, *Sierra Club* v. *California Coastal Com.* (1993) 19 Cal.App.4th 547 [23 Cal.Rptr.2d 534], relied upon by Arambel, is inapposite.

description of the development project and its effects ignored in the FEIR. The FEIR was thus premised on an improperly "curtailed" and "distorted" project description. (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 192 [139 Cal.Rptr. 396].) Since "[a]n accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR" (*id.* at p. 193), even were the FEIR deemed to be adequate in all other respects, the selection and use of a "truncated project concept" violated CEQA and mandates the conclusion that the County did not proceed " 'in a manner required by law.' " (*Id.* at p. 200; *City of Santee* v. *County of San Diego* (1989) 214 Cal.App.3d 1438, 1454-1455 [263 Cal.Rptr. 340].)[7]

CEQA applies to "discretionary projects proposed to be carried out or approved by public agencies." (Pub. Resources Code, § 21080, subd. (a).) State CEQA Guidelines section 15378, subdivision (a) defines the term "Project" as "the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately," and which is undertaken, supported or approved by a public agency. Subdivision (c) of this section states, "[t]he term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." " 'Project' is given a broad interpretation in order to maximize protection of the environment." (*McQueen* v. *Board of Directors* (1988) 202 Cal.App.3d 1136, 1143 [249 Cal.Rptr. 439].) This ensures "that environmental considerations do not become submerged by chopping a large project into many little ones, each with a potential impact on the environment, which cumulatively may have disastrous consequences." (*Burbank-Glendale-Pasadena Airport Authority* v. *Hensler* (1991) 233 Cal.App.3d 577, 592 [284 Cal.Rptr. 498]; see also *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283-284 [118 Cal.Rptr. 249, 529 P.2d 1017].)

"An accurate project description is necessary for an intelligent evaluation of the potential environmental effects of a proposed activity." (*McQueen* v. *Board of Directors, supra,* 202 Cal.App.3d at p. 1143.) In *McQueen,* the appellate court explained that "[a] narrow view of a project could result in the fallacy of division [citation], that is, overlooking its cumulative impact by separately focusing on isolated parts of the whole." (*Id.* at p. 1144.) Essentially, appellants argue this "fallacy of division" occurred here; they are correct.

Under the heading "Project Description," the DEIR states in its entirety: "The proposed project will consist of 633 single family dwelling units, a

---

[7]This deficiency was specifically raised at the administrative level and was alleged in the petition. The trial court found the project description "complied with CEQA."

40,500 square foot neighborhood commercial center, and a 13.93 acre park (Figure 4, site Plan and Figure 5 - Development Entrance). The 3.83 acre neighborhood commercial area is proposed to be located along River Road. The proposed park would be located at the southeasterly corner of the project site. The preliminary Park Masterplan is shown in Figure 6. While the total project size equals 154.24 acres, the area proposed for residential development is 136.48 acres. Based on the State of California, Department of Finance, Stanislaus County household projection for 1990 which is 2.81 persons per household, the proposed residential development could result in the generation of 1,779 new residents to Grayson."

Although not included in the "Project Description" quoted above, sewer expansion is a required element of the development project. The DEIR states: "The proposed project would require the construction of sewer interceptor and collector lines throughout the development as well as the extension of existing sewer lines to serve the project site. . . . The Grayson Community Services District has indicated they can provide service to the project site if the existing wastewater treatment plant is expanded." The cost of expansion will be paid by Arambel. A preliminary study to determine "the scope of the expansion project" was prepared (feasibility report). One of the conditions of approval of the project is that "a use permit be obtained for the expansion of the Grayson Sewage Treatment Facility." The record strongly supports appellants' assertion that "it is absolutely clear that the housing development cannot go forward without the sewer expansion, . . . Thus the 'total project' includes *both* the housing and the sewer project necessary to serve it."

Despite the necessity of the sewer expansion, one cannot discern its scope or environmental consequences from the FEIR. The feasibility report to which the DEIR refers confines itself to considerations of "cost and feasibility" and contains no discussion or analysis of its environmental consequences.[8]

Appellants correctly analogize the instant case to *Santiago County Water Dist.* v. *County of Orange, supra,* 118 Cal.App.3d 818. In *Santiago,* the appellate court held that an EIR on a proposed mining operation was inadequate because it failed to include "a description of the facilities that will have to be constructed to deliver water to the mining operation, or facts from which to evaluate the pros and cons of supplying the amount of water that the mine will need." (At p. 829.) The court wrote: "The construction of

---

[8]In fact, this report is based on a development of 900 homes and not the 633 homes actually proposed.

additional water delivery facilities is undoubtedly one of the significant environmental effects of the project. As such, a description of the necessary construction had to be included if the EIR was to serve its informational purpose. [Citations.] Because of this omission, some important ramifications of the proposed project remained hidden from view at the time the project was being discussed and approved. This frustrates one of the core goals of CEQA. 'Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance. An accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR.' " (118 Cal.App.3d at pp. 829-830, fn. omitted.)

Construction of additional sewer capacity is directly analogous to construction of additional water delivery facilities. Both are crucial elements without which the proposed projects cannot go forward. Both have significant effects on the environment, as evidenced by the fact that a separate EIR was prepared and certified for the sewer expansion (expansion EIR). Here, as in *Santiago*, the EIR ignored the environmental effects of the excluded element, thereby frustrating a "core goal[] of CEQA." (*Santiago County Water Dist.* v. *County of Orange, supra,* 118 Cal.App.3d at p. 830.)

As recognized in the expansion EIR, the sewer expansion will, among other environmental effects, negatively impact air emissions, significantly impact existing water quality, and cause "[o]n-site flooding and overflow of the existing and proposed facilities during heavy rain." This "presents a potential for flood waters to mix with treated wastewater." Most importantly, the sewer expansion could result in excess capacity and lead to "additional residential growth" beyond the development project. Since the sewer expansion was treated as a separate project and was not considered as part of the development project, none of these environmental impacts was identified, much less considered, in connection with the impacts of the development project identified in the FEIR.[9]

As an illustration, both the FEIR and the expansion EIR state that the projects as defined within will have growth-inducing effects. However, the growth-inducing effects of the development project identified in the FEIR were never considered in conjunction with the growth-inducing effects of the

---

[9]Pursuant to Evidence Code section 452, subdivisions (c), (g) and (h), Arambel's request for judicial notice of the draft EIR prepared for the sewer expansion and the resolution approving the expansion EIR is granted.

sewer expansion. In fact, far from considering the cumulative growth-inducing effects of the development project and the sewer expansion, the DEIR actually asserts the sewer expansion will *not* be growth inducing because it will "only include capacity to serve the development within the project site." This conclusion is *contradicted* by statements in the expansion EIR, such as the "[p]otential creation of additional capacity beyond that capacity necessary to accommodate known residential growth." It is this potential excess sewer capacity which would then "accommodate additional residential growth within the Town of Grayson," as also noted in the expansion EIR. Because the project description was improperly truncated, one cannot accurately discern the true growth-inducing effects of the entire development project on the surrounding community from the FEIR.

Moreover, even assuming the sewer expansion was severable from the development project, the FEIR still did not comply with CEQA. Public Resources Code section 21083, subdivision (b) requires the cumulative effects of two separate projects which are "individually limited but cumulatively considerable" to be addressed in the EIR. Thus, even were the sewer expansion deemed to be a separate "project," Public Resources Code section 21083 requires that the cumulative environmental effects of the development project plus the "expansion project" must be considered in the FEIR. Yet the FEIR contains no analysis of the *combined environmental effects* of the proposed development plus the sewer expansion either as two severable projects or as one project. This deficiency is most obvious when the loss of prime agricultural land is considered. Arambel makes much of the fact the development project will necessitate the loss of only 11 acres of prime farmland. However, the sewer expansion will claim another 12 acres of prime farmland. Thus, the total loss of prime farmland is 23 acres, not 11, more than twice that represented in the FEIR. Because the sewer expansion was severed from the project description and the combined impacts of the project and the expansion were not considered in the FEIR, the Board did not have this information before it and its decision to approve the project was, in part, based upon an inaccurate assessment of the amount of prime farmland to be converted to alternative uses as a direct result of the development project.

Arambel argues that preparation of the expansion EIR and the feasibility report which were "considered in connection with these project approvals" satisfied CEQA. However, neither the expansion EIR nor the feasibility report was included in the FEIR. Moreover, the feasibility report contains no discussion of the environmental consequences of the sewer expansion. As appellants persuasively argue, the FEIR itself "tells the public and decision

makers nothing about how the impacts of the treatment plant expansion would combine with the impacts of the 633 houses. If that information had been clearly set forth in the beginning, it could have significantly affected how the County considered mitigation measures and overall alternatives to the project."

In *Santiago County Water Dist.* v. *County of Orange, supra,* 118 Cal.App.3d 818, the county attempted to remedy the inadequacies of the EIR at issue by submitting separate evidence addressing the availability of water resources. The court ruled that evidence outside the EIR itself "is beside the point. It is the adequacy of the EIR with which we are concerned, not the propriety of the board of supervisors' decision to approve the project. ' "[*W*]*hatever is required to be considered in an EIR must be in that formal report*; what any official might have known from other writings or oral presentations cannot supply what is lacking in the report." ' " (At p. 831, italics added; see also *Laurel Heights, supra,* 47 Cal.3d at p. 405.) The expansion EIR and other documentation not incorporated into the FEIR is irrelevant to the determination whether the FEIR adequately addressed this aspect of the project and the environmental effects caused thereby.

"[O]nly through an accurate view of the project may the public and interested parties and public agencies balance the proposed project's benefits against its environmental cost, consider appropriate mitigation measures, assess the advantages of terminating the proposal and properly weigh other alternatives . . . ." (*City of Santee* v. *County of San Diego, supra,* 214 Cal.App.3d at p. 1454.) Here, the failure to consider the expansion of the wastewater treatment plant as part of the project under consideration resulted in an inaccurate project description and incomplete identification and analysis of the environmental effects of the development project. (*Santiago County Water Dist.* v. *County of Orange, supra,* 118 Cal.App.3d at p. 829.) As stated in *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 166 [217 Cal.Rptr. 893], "[t]he danger of filing separate environmental documents for the same project is that consideration of the cumulative impact on the environment of the two halves of the project may not occur. This danger was here realized."

Thus, because the FEIR did not "adequately apprise all interested parties of the true scope of the project for intelligent weighing of the environmental consequences of the project," informed decisionmaking was precluded. The FEIR is inadequate as a matter of law. (*City of Santee* v. *County of San Diego, supra,* 214 Cal.App.3d at pp. 1454-1455.) The certification by the Board of the FEIR as complete and adequate constituted an abuse of

discretion. (*County of Inyo* v. *City of Los Angeles, supra*, 71 Cal.App.3d at p. 200.)

c. *Alternative sites.*

A major function of an EIR "is to ensure that all reasonable alternatives to proposed projects are thoroughly assessed by the responsible official." (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 197 [132 Cal.Rptr. 377, 553 P.2d 537].) As explained by this court: "An EIR must '[d]escribe a range of reasonable alternatives to the project or to the location of the project, which could feasibly attain the basic objectives of the project and evaluate the comparative merits of the alternatives.' (Guidelines, § 15126, subd. (d).) The discussion must 'focus on alternatives capable of eliminating any significant adverse environmental effects or reducing them to a level of insignificance, even if these alternatives would impede to some degree the attainment of the project objectives, or would be more costly.' (Guidelines, § 15126, subd. (d)(3).)" (*Kings County Farm Bureau* v. *City of Hanford, supra*, 221 Cal.App.3d at p. 733.) This discussion of alternatives must be "meaningful" and must "contain analysis sufficient to allow informed decision making." (*Laurel Heights, supra*, 47 Cal.3d at pp. 403-404.) The decision to require mitigation measures does not remove the need to consider project alternatives in the EIR. (*Id.* at pp. 401-402.) **(6a)** Because the FEIR's discussion of alternatives is "lacking in any concrete information or analysis," it fails to meet this standard.[10]

The DEIR contains a one and one-half page section entitled "Alternatives to the Proposed Project," which may be accurately described as "cursory at best." (*Laurel Heights, supra*, 47 Cal.3d at p. 403.) Headings are labeled "No Project," "Density Alternatives," "Larger Annexation," and "Alternative Site." Under the heading labeled "No Project," the FEIR states, "It is assumed that there is sufficient demand for residential development, and this project or a similar project could be implemented at several locations in the west side of Stanislaus County." The entire discussion of density alternatives reads: "A lower density will lessen the impacts, but may not ensure that infrastructure improvements would be economically feasible. A higher density would increase the level of impacts on the circulation

[10]We reject Arambel's contention that appellants failed to exhaust their administrative remedies on this issue. The Board was informed "the project alternatives analysis" was "inadequate as a matter of law" and was provided with a copy of this court's decision in *Kings County Farm Bureau* v. *City of Hanford, supra*, 221 Cal.App.3d 692, which specifically addresses this issue. These actions sufficiently preserved the issue for review. (*Citizen Assn. for Sensible Development of Bishop Area* v. *County of Inyo, supra*, 172 Cal.App.3d at pp. 162-163.)

system and public services, and there is no indication that there is sufficient demand for higher density developments." Under the heading alternative site, the DEIR states, "There are numerous alternative sites for the project, including existing incorporated cities, other unincorporated communities, and proposed new communities. The impacts associated with this development would be much the same if implemented at alternative sites on the west side." No specific alternative sites are identified and there is no indication in the FEIR that the "numerous alternative sites" mentioned as existing in the DEIR were ever specifically identified or considered.

*San Bernardino Valley Audubon Society, Inc.* v. *County of San Bernardino* (1984) 155 Cal.App.3d 738 [202 Cal.Rptr. 423], is analogous. In *San Bernardino*, the appellate court held that an EIR prepared in connection with a proposed cemetery development inadequately analyzed alternative sites. After noting that "EIRs are not required to be perfect or to discuss project alternatives beyond what is realistically possible," the court found the EIR at issue did not "produce information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned." (*Id.* at pp. 750-751.) The EIR was insufficient because it did "not discuss whether there actually *are* other sites within the Big Bear area which would be suitable for such a project," or discuss the location or attributes of a parcel of property for which the forest service had proposed a land trade or why this site would or would not be a feasible alternative. "In short, the EIR does not contain the required sufficient degree of analysis to provide decisionmakers with information to allow them to intelligently take account of environmental consequences." (*Id.* at p. 751.)

The instant case is markedly similar. The DEIR states there are "numerous alternative sites" available for the project, but does not identify any of these sites, discuss their attributes or indicate why these sites would or would not be feasible. In fact, it is not clear from the record whether any specific alternative sites were actually identified, much less seriously considered by the lead agency. Like the EIR at issue in *San Bernardino Valley Audubon Society, Inc.* v. *County of San Bernardino, supra*, 155 Cal.App.3d 738, the FEIR here did not adequately identify and analyze the feasibility of admittedly available alternative sites.

Moreover, the discussion of density alternatives is also inadequate. The DEIR states that a lower density would "lessen the impacts," but does not state which of the impacts would be lessened or to what degree. Such a bare conclusion without an explanation of its factual and analytical basis is insufficient. (*San Bernardino Valley Audubon Society, Inc.* v. *County of San*

*Bernardino, supra,* 155 Cal.App.3d at p. 751; cf. 1 Practice Under CEQA, *supra,* § 13.28, p. 525.)

That lower density might not be "economically feasible," is not sufficient justification for the failure to give *basic* information as to density alternatives which were considered and rejected. (State CEQA Guidelines, § 15126.)

■ Contrary to the County's argument, appellants are not required to show there are reasonable alternatives. "It is the project proponent's responsibility to provide an adequate discussion of alternatives. . . . If the project proponent concludes there are no feasible alternatives, it must explain *in meaningful detail* in the EIR the basis for that conclusion." (*Laurel Heights, supra,* 47 Cal.3d at p. 405, italics added.) Thus, even if alternatives are rejected, an EIR must explain why each suggested alternative either does not satisfy the goals of the proposed project, does not offer substantial environmental advantages or cannot be accomplished. (*Id.* at pp. 404-405.) ■ The FEIR failed to meet this standard.

Relying on *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553 [276 Cal.Rptr. 410, 801 P.2d 1161] (hereafter *Goleta II*) and *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704 [29 Cal.Rptr.2d 182], Arambel argues alternatives need not be mentioned unless they offer substantial environmental advantages over the project under consideration. Both cases are inapposite. In *Goleta II*, the lead agency conducted "an exhaustive regional and environmental survey," and the EIR "considered a full range of project alternatives, including at least one reasonable off- site alternative." (52 Cal.3d at p. 573.) In fact, the EIR considered 12 specific alternatives to the project and the only alleged inadequacy was the failure to "review in depth" additional sites identified after expiration of the comment period. (*Id.* at p. 566.) The court wrote that while only feasible alternatives "merit in-depth consideration," the EIR should set forth alternatives which were rejected and the reasons underlying this determination. (*Id.* at p. 569.) Thus, *Goleta II* does not stand for the proposition that only "feasible" alternatives need be mentioned in an EIR; rather, only feasible alternatives require extended consideration. (*Ibid.; Sequoyah Hills Homeowners Assn. v. City of Oakland, supra,* 23 Cal.App.4th at p. 715.) Additional sites identified after expiration of the comment period are not at issue here. Moreover, no "exhaustive survey" of alternative sites was conducted, there is no indication in the record why unidentified alternative sites would be infeasible, and the discussion of density alternatives was not specific enough to permit informed decision making. *Goleta II* is not analogous.

*Sequoyah Hills Homeowners Assn.* v. *City of Oakland, supra,* 23 Cal.App.4th 715, is similarly distinguishable. The EIR at issue in *Sequoyah Hills* was clearly superior to that presented here. It evaluated plans "for development of 0, 36, 45, 46 and 63 units" at the site and undertook in-depth analysis of two alternatives to the original proposal. It was undisputed that the EIR adequately discussed the identified alternatives. The court merely rejected an argument that the EIR should have examined additional density alternatives, finding that such discussions "would have been an exercise in futility." (*Id.* at p. 714.) No such thoroughness and specificity is presented here.

Arambel's argument that alternative sites need not be identified because substantial evidence supports the County's conclusion that locating the project elsewhere would result in similar impacts also fails. Since the environmental setting of the site was not accurately and fully assessed (see *ante,* pt. 1.b.), comparisons between it and other unidentified sites are necessarily unreliable. Other alternative sites might not be adjacent to wetland areas or SJWF. Other sites might not require sewer expansion and less prime farmland would have to be converted. Because the FEIR failed to adequately identify the location and extent of wetland habitats adjacent to and possibly within the site and downplayed the significance of the adjacent San Joaquin River, such alternative locations were not explored. Even alternatives to the proposed project such as changing the location of the park site or "clustering" the houses were not considered, nor was an increase in the size of the buffer zone or lowered density considered even though these changes may relate to protection of the adjacent wetland/riparian habitat.

Arambel's assertion at oral argument that alternative sites need not be considered because they would necessitate the loss to the town of Grayson of the "substantial benefits" the development project would bring is facile. It may be true that if the project were located elsewhere, Grayson would lose these benefits; however, if so, another community would be similarly enriched. An EIR is not a document of advocacy but of information.

In sum, the discussion of alternatives does not foster "informed decision making" (*Laurel Heights, supra,* 47 Cal.3d at p. 402) as it is devoid of substantive factual information from which one could reach an intelligent decision as to the environmental consequences and relative merits of the available alternatives to the proposed project. It does not "reflect the analytic route the agency traveled from evidence to action." (*Kings County Farm Bureau* v. *City of Hanford, supra,* 221 Cal.App.3d at p. 733 [which held, in relevant part, that the EIR at issue failed to contain a thorough assessment of

all reasonable alternatives to the proposed project].) Because the discussion of alternatives omitted relevant, crucial information, it subverted the purposes of CEQA and is legally inadequate. (*Ibid.*; *San Bernardino Valley Audubon Society, Inc.* v. *County of San Bernardino*, *supra*, 155 Cal.App.3d at pp. 750-751.)

### d.   *Cumulative impacts.*

Appellants also correctly contend that the FEIR failed to list other development projects currently under consideration or construction in the immediate area and did not adequately address the cumulative impacts of the development project.

CEQA requires an EIR to discuss the cumulative effect on the environment of the subject project in conjunction with other closely related past, present and reasonably foreseeable probable future projects. (Pub. Resources Code, § 21083, subd. (b); State CEQA Guidelines, §§ 15130,[11] 15355.) The term "'[c]umulative impacts' refer[s] to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." (State CEQA Guidelines, § 15355.) If an identified cumulative impact is not determined to be significant, an EIR is "required to at least briefly state and explain such conclusion." (*Citizens to Preserve the Ojai* v. *County of Ventura* (1985) 176 Cal.App.3d 421, 432 [222

---

[11]State CEQA Guidelines section 15130 provides:

"(a) Cumulative impacts shall be discussed when they are significant.

"(b) The discussion of cumulative impacts shall reflect the severity of the impacts and their likelihood of occurrence, but the discussion need not provide as great detail as is provided of the effects attributable to the project alone. The discussion should be guided by the standards of practicality and reasonableness. The following elements are necessary to an adequate discussion of cumulative impacts:

"(1) Either:

"(A) A list of past, present, and reasonably anticipated future projects producing related or cumulative impacts, including those projects outside the control of the agency, or

"(B) A summary of projections contained in an adopted general plan or related planning document which is designed to evaluate regional or areawide conditions. Any such planning document shall be referenced and made available to the public at a location specified by the lead agency;

"(2) A summary of the expected environmental effects to be produced by those projects with specific reference to additional information stating where that information is available, and

"(3) A reasonable analysis of the cumulative impacts of the relevant projects. An EIR shall examine reasonable options for mitigating or avoiding any significant cumulative effects of a proposed project.

"(c) With some projects, the only feasible mitigation for cumulative impacts may involve the adoption of ordinances or regulations rather than the imposition of conditions on a project-by-project basis."

Cal.Rptr. 247].) The importance of the cumulative effect analysis was explained in *Las Virgenes Homeowners Federation, Inc.* v. *County of Los Angeles* (1986) 177 Cal.App.3d 300, 306 [223 Cal.Rptr. 18]: "The purpose of this requirement is obvious: consideration of the effects of a project or projects as if no others existed would encourage the piecemeal approval of several projects that, taken together, could overwhelm the natural environment and disastrously overburden the man-made infrastructure and vital community services. This would effectively defeat CEQA's mandate to review the actual effect of the projects upon the environment."

Here, the FEIR does not comply with CEQA because it fails to contain a list of "past, present and reasonably anticipated future projects," or a summary of projections contained in an adopted general plan for a summary of cumulative development as is required by State CEQA Guidelines section 15130. In fact, the FEIR never specifically lists the other development projects encompassed in its analysis of the cumulative effects of the development project at issue.

That other development projects have been proposed is clear from the record. Subdivisions named Del Rio Vista and Del Rio Ranch were considered by the Board at the same meeting during which it considered the development project. In addition, the FEIR states that "[w]ithin a 5 mile radius" of the development project there are "two other existing or potential projects." One of these projects is identified as Mapes Ranch, a "large project, potentially including a 'new town' of 25,000 people as well as industry, a university campus, and a wildlife refuge." The other project is not identified.

Mapes Ranch, Del Rio Vista and Del Rio Rancho were not identified in the DEIR. There is no indication the environmental effects of these specific projects were considered in conjunction with the development project. Rather, without any identification of the "other development" in the area or any factual analysis, the DEIR simply asserts that nonspecific "cumulative development" will change the character of the community, increase light and glare and lead to the loss of agricultural land. However, the DEIR inexplicably concludes, without any supporting facts or analysis, that although there has been a "vast reduction in wildlife habitat areas, particularly wetlands," due to "encroachment into natural areas . . . as a result of urban expansion," the "[c]umulative development of this and other projects within the Grayson Area will not contribute to that trend."

The failure of the DEIR to list and consider the cumulative effect of other specific projects such as Mapes Ranch, Del Rio Vista and Del Rio Rancho is

most clearly evidenced by the traffic analysis contained in the DEIR. This analysis does not address any of other planned developments in the area, referring only to one other project, the ninety-five currently existing homes in the Grayson Park Unit 2 development. In fact, the traffic analysis actually contradicts the FEIR by asserting that other than Grayson Park Unit 2, "[t]here are no planned projects in the immediate area of the project site."

Thus, because other development projects are neither listed nor adequately discussed in the FEIR and the conclusions reached in the DEIR concerning the effects of cumulative development are not supported by complete and accurate facts and analysis, the cumulative discussion is inadequate as a matter of law. (*Citizens to Preserve the Ojai* v. *County of Ventura, supra,* 176 Cal.App.3d at p. 429.)

### 2. *Issuance of an injunction is necessary.*

If the reviewing court determines a public agency's decision was made absent full compliance with CEQA, and a project activity "will prejudice the consideration or implementation of particular mitigation measures or alternatives to the project," the court may direct the trial court to issue an order enjoining respondents and real parties from undertaking any actions which could result in "an adverse change or alteration to the physical environment, until the public agency has taken any actions that may be necessary to bring the . . . decision into compliance with [CEQA]." (Pub. Resources Code, § 21168.9, subd. (a)(2).) "[T]raditional equitable principles" are used to determine "whether injunctive relief is appropriate." (*Laurel Heights, supra,* 47 Cal.3d at p. 423.)

Here, injunctive relief is necessary both to protect the site from adverse and possibly irreparable alteration prior to full and accurate assessment and disclosure of the scope and environmental impacts of the development project and to ensure adequate consideration of alternative sites and additional mitigation measures which may be identified in the revised EIR.[12]

First, the FEIR is a mass of flaws. Beginning with an incomplete project description, continuing with an inaccurate and misleading description of the site followed by an inadequate discussion of alternatives and concluding with an incomplete and conclusionary discussion of the cumulative effects of the development project, the FEIR fails to comply with CEQA in all major

---

[12]This issue was not raised by appellants. However, "[a]n appellate court has the power to raise issues on its own motion." (*Walton* v. *City of Red Bluff* (1991) 2 Cal.App.4th 117, 129 [3 Cal.Rptr.2d 275].) In compliance with Government Code section 68081, each party submitted a supplemental letter brief addressing the necessity of injunctive relief.

respects.[13] If an injunction is not issued, surveying and construction may commence absent any meaningful exploration and public disclosure of the true scope of the development project, its sensitive environmental setting, environmental impacts or feasible alternatives. It is all too likely that if such activities proceed pending preparation of an adequate EIR, momentum will build and the project will be approved, no matter how severe the environmental consequences identified in the new EIR. Consideration of alternative sites or density or additional mitigation measures, such as a larger buffer zone or different location or configuration of the proposed park site will be prejudiced, for the development project will have proceeded well beyond the planning stages and change will be both more difficult to effect and less likely to occur.

Second, because the record indicates there may be wetlands within the site and because the extent and exact location of the wetlands in the surrounding area have not been adequately explored, such activities on the site could result in an adverse and irreparable change in the physical environment. Wetlands could be destroyed even before they are adequately identified.

The record demonstrates what only can be characterized as grudging and pro forma compliance with CEQA. Without relief, the site may be damaged and the important purposes of CEQA will be subverted. The County has not opposed issuance of an injunction and Arambel failed to demonstrate any specific injury or prejudice it will suffer as a result.[14] Equity strongly supports issuance of an injunction enjoining the County and Arambel from all activities on the site or in furtherance of the development project pending full compliance with CEQA.

### Disposition

The judgment denying the petition is reversed and the cause remanded to the Superior Court of Stanislaus County. Upon remand, the court is directed:

1. To issue a writ of mandate directing respondent County to void its certification of the FEIR and findings of overriding consideration of the

---

[13]The noncompliance tainted the analysis of the entire development project and not just one severable portion. Therefore, cases such as *Laurel Heights, supra,* 47 Cal.3d at pages 422-425 and *City of Santee* v. *County of San Diego, supra,* 214 Cal.App.3d at pages 1455-1457, on which Arambel relies, are inapposite. In *Laurel Heights* and *City of Santee* the defects in the EIR related only to future activities and feasible alternatives both of which were determined to be discrete and severable issues. Here, the vast array of inadequacies in the FEIR precludes severance.

[14]Arambel's assertions that appellants have not acted in good faith and that the "local community has spoken firmly in favor of the value and importance" of the development project are without support in the administrative record.

significant and unavoidable environmental impacts of the project, and to void its approvals of the general plan amendment, rezone application and tentative subdivision map;

2. To issue an order enjoining respondents from approving or carrying out the development project and to suspend all activity which could result in any change or alteration to the physical environment of the site until full compliance with CEQA is effected. Among other things, such compliance will require preparation and certification of an EIR which accurately describes the development project, fully and accurately describes and analyzes the site and surrounding environs, adequately analyzes alternatives to the project, fully and completely considers the environmental impacts of the development project and, after listing each of the other pending projects in the area, fully and completely analyzes the cumulative impacts of the development project;

3. To conduct a hearing for the limited purpose of determining whether appellants should be awarded attorney fees pursuant to Code of Civil Procedure section 1021.5, the amount thereof and the party or parties against whom they are to be assessed.

Costs are awarded to appellants, apportioned as follows: Arambel is to pay 90 percent of costs; the County to pay 10 percent. (Cal. Rules of Court, rule 26(a).)

Ardaiz, Acting P. J., and Thaxter, J., concurred.

A petition for a rehearing was denied September 12, 1994, and the opinion was modified to read as printed above.