[No. F059293. Fifth Dist. Nov. 19, 2010.]

RENEE D. NELSON et al.; Plaintiffs and Appellants, v.
COUNTY OF KERN, Defendant and Respondent;
CARLTON GLOBAL RESOURCES, Real Party in Interest and Respondent.

258

COUNSEL

Baker, Manock & Jensen, John L. B. Smith, Christopher L. Campbell and Amanda M. Neal for Plaintiffs and Appellants.

Theresa Goldner, County Counsel, and Charles F. Collins, Deputy County Counsel, for Defendant and Respondent.

Kronick, Moskovitz, Tiedemann & Girard, Scott A. Morris, William T. Chisum and Hanspeter Walter for Real Party in Interest and Respondent.

OPINION

**KANE, J.**—In this action under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA),[1] Renee D. Nelson and Clean Water and Air Matters (petitioners) challenged the adequacy of the environmental analysis performed by respondent County of Kern (County) concerning a proposed surface mining operation on 40 acres of foothill property in the County. Carlton Global Resources (Carlton), the real party in interest, submitted a proposal that included mining of calcite marble from the site for a 30-year period and a reclamation plan to restore the land thereafter.[2] The reclamation plan was required by the provisions of the Surface Mining and Reclamation Act of 1975 (§ 2710 et seq.; SMARA).[3] County limited its environmental review to the reclamation plan only and did not consider or

---

[1] Unless otherwise indicated, all further statutory references are to the Public Resources Code. There are also regulations that supplement or clarify the statutory law of CEQA. These regulations are found at California Code of Regulations, title 14, section 15000 et seq., and are referred to herein as CEQA Guidelines.

[2] The applications were actually made through Carlton's predecessor entities, as clarified herein below.

[3] SMARA requires reclamation plans for surface mining operations in California after 1975 (§§ 2710, 2711, 2712, 2770, 2776) and provides, among other things, that "no person shall conduct surface mining operations unless a permit is obtained from, a reclamation plan has

analyze the potential impacts of Carlton's proposed mining operations. County took that approach because the mining would take place on federally owned land and, as such, the Bureau of Land Management (BLM) was considered to be the sole permitting agency for purposes of mining operations and responsible to perform its own environmental review pursuant to the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 et seq.; NEPA). County also believed that its approach was consistent with a memorandum of understanding (MOU) between BLM and the State of California. After BLM completed its environmental assessment under NEPA and approved Carlton's plan for surface mining operations, County separately considered the reclamation plan.[4] County adopted a negative declaration and approved the reclamation plan.

Petitioners filed a petition for writ of mandate seeking to set aside County's determinations and approvals on the ground that the failure to review the *entire* project—including the mining operations—violated CEQA and constituted an abuse of discretion. The trial court disagreed with petitioners' analysis, concluded that County did not err in limiting its consideration to the reclamation plan, and entered a judgment denying the petition. Petitioners appealed. We conclude petitioners are correct in their fundamental claim on appeal: County's role as lead agency under CEQA, in conjunction with its responsibilities under SMARA, required it to evaluate the environmental effects of the whole surface mining project even though that project was on federally owned land.

## FACTS AND PROCEDURAL HISTORY

The remote Jawbone Canyon area in the Southern Sierra Nevada foothills contains significant mineral deposits of what BLM describes as "an uncommon variety" of calcite marble. The purity and other characteristics of the calcite marble found in this location make it a valuable resource for production of high-quality or special-use calcium carbonate and calcite that have a number of beneficial commercial and industrial applications. Approximately 8.3 acres of the Jawbone Canyon area were previously surface mined and that site was (and *is*) commonly known as the Monarch Calcite Quarry. As a result of the prior mining operations, several exposed, open-face side-hill cuts remain at the site of the former mine.

In the present case, Carlton proposed to restart surface mining of calcite marble at the Monarch Calcite Quarry and thereafter to expand such mining

been submitted to and approved by, and financial assurances for reclamation have been approved by, the lead agency for the operation pursuant to this article." (§ 2770, subd. (a).)

[4] Not only was the reclamation plan itself considered separately, but County's environmental review was not aided by the federal environmental study. That is, County did not adopt, rely on or consult BLM's environmental documents.

to the surrounding land. The planned surface mining and reclamation activities would, if approved, take place on a total of 40 acres of federally owned land that included the original 8.3-acre site of the Monarch Calcite Quarry. The 40-acre parcel was (and is) entirely within County boundaries.

*Concurrent Applications to County and BLM*

Although this dispute concerns *Carlton's* mining and reclamation plans, and in particular the sufficiency of County's environmental review thereof, the initial applications to both County and BLM were made by Carlton's predecessors in interest, including Alpha Minerals & Chemicals LLC (Alpha Minerals) and Tri-Western Resources, LLC (Tri-Western). Therefore, as we summarize the background facts at this point in our discussion, we track the steps taken in the approval process by reference to these predecessor entities of Carlton.[5]

On February 28, 2005, Alpha Minerals filed an "APPLICATION FOR SURFACE MINING PERMIT AND/OR RECLAMATION PLAN" with County's planning department. The project described therein included a plan to surface mine calcite marble at the site of the former Monarch Calcite Quarry for a period of 30 years and a reclamation plan related thereto. This document appears to be an early or preliminary version of the subsequently proposed mining and reclamation plan and encompassed only the 8.3-acre site of the original Monarch Calcite Quarry.

Subsequently, on March 14, 2005, Tri-Western filed a proposed mine plan of operations with BLM, which was revised on April 6, 2005, and August 22, 2005. The proposed plan and revisions thereto were submitted to BLM in order to obtain a lease or permit from BLM for conducting mining operations on federal land. The second revision thereto, entitled "REVISED MINE PLAN OF OPERATIONS AND RECLAMATION PLAN FOR U.S. BUREAU OF LAND MANAGEMENT AND KERN COUNTY, CA . . . ," was filed in response to comments received from BLM and County and clearly specified that the mining plan covered a total of 40 acres on BLM land. It also referred to the filing of a SMARA plan with County. The proposed plan (as revised) was presented by Tri-Western "on the Kern County SMARA form" in order to represent both "a Plan of Operations . . . for the BLM and a Reclamation Plan for Kern County, California under [SMARA]."

The same mining and reclamation plans were proposed or submitted to County. Tri-Western submitted an "APPLICATION FOR SURFACE MINING PERMIT AND/OR RECLAMATION PLAN" to County's planning

---

[5] Aside from this brief summary of the initial application and approval process, we shall otherwise refer herein to the project proponent solely as Carlton.

commission, which application included *both* the mining plan and the reclamation plan. The application was dated August 2005, but apparently the completed application was not filed with County until October 17, 2005. The application's description of the planned mining and reclamation activities duplicated what was set forth in the documents presented to BLM. That is, the project would entail surface mining of calcite marble on the 40-acre parcel of federal land over a 30-year period, followed by implementation and completion of the reclamation plan. Mine production would be approximately 250,000 cubic yards of calcite marble annually. Daily mine operations would involve initial crushing and screening of calcite ore onsite, then loading the material into 25-ton trucks for transport to an undisclosed offsite location for further processing, with average daily truck trips estimated at 40 per day.

The above submission to County included a document executed by Tri-Western on June 15, 2005, entitled "STATEMENT OF RESPONSIBILITY," in which Tri-Western confirmed in writing that it would perform all provisions and conditions imposed by County pursuant to "the Ordinance Code of Kern County (Chapter 19.100)." The referenced County ordinance explicitly addresses "SURFACE MINING OPERATIONS" and was adopted by County for the express purpose of regulating surface mining within County in a manner consistent with the requirements of laws such as SMARA. (County Zoning Ord., § 19.100.010.) Among other things, the ordinance provides: "[N]o surface mining operations may be undertaken anywhere in unincorporated Kern County unless a surface mining permit and a reclamation plan has been submitted to and approved by the Planning Commission in accordance with the procedures set out in Sections 19.102.130 through 19.102.180 of this title." (County Zoning Ord., § 19.100.020.)

Additionally, Tri-Western's documentation filed with County included an "ENVIRONMENTAL INFORMATION FORM" to assist County in its CEQA review process. The form was signed on June 15, 2005, and was filed with County's planning commission on October 17, 2005. In said environmental information form, Tri-Western described the "project for which this form is filed" as a *"Surface Mine (Quarry)."* (Italics added.)

To summarize the above referenced submissions by Tri-Western (as Carlton's predecessor) regarding surface mining and reclamation plans, it appears that applications were made to *both* County and BLM for governmental approvals,

the applications were submitted within the same general time period in 2005 and the applications were, at least for a brief time, pending concurrently.[6]

*BLM Completes NEPA Assessment and Approves Mining Application*

BLM acted first. As the proposed mining was to occur on federal land, BLM, as the responsible federal agency, proceeded to conduct an environmental review thereof in compliance with NEPA standards. BLM completed its "Environmental Assessment" of the planned mining operations and, based on that assessment, adopted a finding under NEPA that said mining operations would have no significant effect on the environment (referred to as a "Finding of No Significant Impact" or a FONSI). Accordingly, the proposed mining operations were approved by BLM from a federal law standpoint. BLM's approval and its written statement of findings (FONSI) were transmitted to Tri-Western by letter dated November 18, 2005.

*County Limits Its Review to the Reclamation Plan*

Sometime after BLM's adoption of the FONSI and resulting approval of mining operations, County proceeded to separately consider whether to approve the reclamation plan. In February of 2006, an "INITIAL STUDY REVIEW" (the Initial Study) of potential environmental impacts (including an "ENVIRONMENTAL CHECKLIST FORM" and attachments) was completed by County's planning commission. The "[p]roject" under review in the Initial Study was described therein as follows: "A Conditional Use Permit to allow *a mining reclamation only plan* in accordance with the Surface Mining and Reclamation Act (SMARA) . . . ." (Italics added.) The Initial Study further emphasized the limited scope of the matter being reviewed: "The applicant is seeking the approval of . . . *a reclamation plan only* on federally administered property in accordance with [SMARA]. Kern County is limited to the reclamation of the mined site, and [BLM] is responsible for the mining activity. The applicant has received approval from the BLM to mine the 40-acre project site for calcite marble over a period of 30 years." (Italics added.)

A staff report by County's planning department similarly explained that County's environmental review and approval was limited to the reclamation plan only: "The applicant is seeking approval of a conditional use permit to approve a reclamation plan. Because this property is located on federally owned land, the BLM is the actual permitting agency for mining operations.

---

[6] Carlton's position is that the only approval it was seeking from County was for the reclamation plan. Even if that were the case, under the circumstances of this case, County was required to comply with its obligation to review the entire project, as we proceed to explain.

Under a *Memorandum of Understanding* entered into between the State of California and [BLM], the reclamation plan falls under the approval authority of the County. The purpose of the reclamation plan is to ensure that the site is reclaimed after mining operations have been concluded." (Italics added.)

The MOU referred to by County staff is an agreement between the State of California, the United States Forest Service (the Forest Service) and BLM, entered with the objective of establishing procedures and guidelines to co-ordinate environmental review, facilitate compliance with state and federal environmental laws and avoid unnecessary duplication in situations where surface mining activities are proposed on federal land. We shall consider the MOU in greater detail at a later point in our discussion. At this juncture, we simply note that County's planning department staff believed the MOU supported their conclusion that County was required to review the reclamation plan only.

County's planning department staff analyzed the environmental effects of the reclamation plan only and identified certain mitigation measures that were necessary to keep the environmental impacts of the reclamation plan at a level that was less than significant. A staff report set forth the opinion that "the proposed reclamation plan, as conditioned, is adequate to ensure that the site will be successfully reclaimed in a manner that complies with local and State requirements." The planning department recommended in the staff report that a mitigated negative declaration be adopted and that the reclamation plan be approved.

On April 27, 2006, County's planning commission held a public hearing relating to the proposed reclamation plan. The hearing culminated in the commission's adoption of resolution No. 84-06, approving Carlton's (Tri-Western's) conditional use permit for the reclamation plan and certifying the mitigated negative declaration in conjunction with the reclamation plan.

An adjacent property owner, Leroy Cass, appealed the commission's decision to County's board of supervisors (the Board), arguing that a complete study of environmental impacts of mining operations should have been conducted by County. The appeal was initially scheduled for June 27, 2006, but the Board continued the hearing several times to allow further consideration of various issues and comments, including the issues raised by petitioners' counsel. Prior to each scheduled hearing, staff reports prepared by County's planning department reiterated the department's firm position that the matter before the Board for its review was "a mining reclamation *only* plan," not a plan for mining operations. (Italics added.)

Petitioners disagreed, arguing in letters and oral argument to the Board that it was improper under CEQA for County to segregate the reclamation plan

from the proposed mining operations because County, as the lead agency, was required to consider the whole of the surface mining project and not merely one part of it in isolation. Petitioners also pointed out that while County may adopt functionally equivalent documents prepared by the federal agency under NEPA (if such documents also meet CEQA standards), County never did so and did not rely on the environmental documents prepared by BLM, and in any event those documents were allegedly insufficient to satisfy CEQA.[7] Finally, petitioners argued to the Board that County's failure to consider the impact of the entire mining operation (not just the reclamation plan) on issues such as air quality, roads and water, among other things, was prejudicial because there was evidence that the entire project would result in significant adverse effects on the environment, and thus preparation of an environmental impact report (EIR) was necessary under CEQA.

At the public hearing on October 9, 2007, after considering the recommendations of the planning department and the arguments presented by petitioners and others, the Board denied the appeal, approved the conditional use permit for the reclamation plan and adopted the mitigated negative declaration concerning the reclamation plan. At that point, as far as Carlton and County were concerned, no further approval was needed for Carlton to begin surface mining.

*The Petition and the Trial Court's Ruling*

On November 14, 2007, petitioners filed their petition for writ of administrative mandate.[8] The petition alleged that County violated CEQA (and SMARA) and abused its discretion because it "improperly restricted its analysis of the PROJECT to the RECLAMATION PLAN" rather than analyze "the entire PROJECT as required by CEQA," including both onsite and offsite impacts of the planned surface mining operations. Further, it was alleged that there was substantial evidence in the record before County to create a fair argument that the entire project may produce significant adverse effects on the environment, including such features as water, air quality and transportation, and therefore an EIR was required under CEQA. For these and other reasons, the petition requested that the trial court issue a writ of mandate directing County to decertify its negative declaration and withdraw

[7] At the final hearing, Kern County Planning Director Ted James advised the Board that all that was before it was the reclamation plan, not the mining operations. He stated that issues related to mining operations were, or should have been, addressed through the federal NEPA process conducted by BLM. He did not say that County ever incorporated, relied on, or even considered the environmental information generated by BLM's NEPA process. In fact, another planning department staff person stated, "I don't think we even knew it was happening." The trial court rightly concluded that BLM's Environmental Assessment was not used by County as a joint or surrogate CEQA document.

[8] Leroy Cass, who is not a party to this appeal, was at that time one of the petitioners.

its approval of the conditional use permit regarding the reclamation plan, and, additionally, to perform an environmental review of the entire scope of the project as required by CEQA, including the preparation of an EIR.

On July 17, 2009, a hearing on the merits of the petition was held in the trial court. On September 11, 2009, after considering the briefing and oral argument presented by the parties, the trial court issued its "Order Denying Petition for Writ of Administrative Mandamus and Judgment in Favor of Respondent County of Kern." (Some capitalization omitted.) In its order, the trial court reasoned that County was correct in limiting its review to the reclamation plan because (1) BLM had sole authority over the approval of the mining operation under the terms of the MOU, (2) the mine would be on federal land, and (3) BLM granted approval of the mining operation before County acted on the reclamation plan. The trial court concluded that the situation was analogous to two appellate cases that allowed reclamation plans to be reviewed separately from preexisting mining operations that operated pursuant to vested rights. Those two cases were *El Dorado County Taxpayers for Quality Growth v. County of El Dorado* (2004) 122 Cal.App.4th 1591 [20 Cal.Rptr.3d 224] (*El Dorado County*) and *City of Ukiah v. County of Mendocino* (1987) 196 Cal.App.3d 47 [241 Cal.Rptr. 585] (*City of Ukiah*). Following entry of judgment, petitioners filed their notice of appeal.

## DISCUSSION

I. *Standard of Review*

In our consideration of petitioners' CEQA challenge, we independently review the administrative record to determine whether County proceeded in a manner consistent with the requirements of CEQA. (*El Dorado County, supra,* 122 Cal.App.4th at p. 1596; *City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398, 405 [117 Cal.Rptr.2d 582] (*City of Redlands*).) As recently summarized by our Supreme Court: "An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.] We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the County and whether it contains substantial evidence to support the County's factual determinations." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 [53 Cal.Rptr.3d 821, 150 P.3d 709].)

In applying this standard of review, we begin with a brief overview of an agency's basic obligations under CEQA. "A governmental agency must

prepare an EIR on any project that may have a significant impact on the environment. If there is no substantial evidence of any significant environmental impact, however, the agency may adopt a negative declaration." (*City of Redlands, supra,* 96 Cal.App.4th at p. 405, fn. omitted.) "A negative declaration is inappropriate . . . and an EIR is required whenever 'it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' [Citation.]" (*City of Ukiah, supra,* 196 Cal.App.3d at p. 52.)

"Generally, an agency will prepare an initial threshold study to gather information necessary to determine whether to prepare an EIR or a negative declaration. The initial study must include a description of the project." (*City of Redlands, supra,* 96 Cal.App.4th at pp. 405–406, fns. omitted.) "Where an agency fails to provide an accurate project description, or fails to gather information and undertake an adequate environmental analysis in its initial study, a negative declaration is inappropriate. [Citation.] An accurate and complete project description is necessary to fully evaluate the project's potential environmental effects. [Citations.]" (*El Dorado County, supra,* 122 Cal.App.4th at p. 1597.)

"The scope of the environmental review conducted for the initial study must include the entire project." (*Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214, 1222 [66 Cal.Rptr.3d 645] (*Tuolumne County Citizens*).) Thus, a correct determination of the nature and scope of the project is a critical step in complying with the mandates of CEQA. (*Tuolumne County Citizens, supra,* at p. 1222.)

## II. *County Erred by Limiting Its Environmental Review to the Reclamation Plan*

Petitioners contend that County was required to review the *entirety* of the surface mining project, *including* mining operations, based on (1) County's lead agency responsibilities under SMARA and CEQA, and (2) a correct definition of what constitutes a CEQA project. We agree. Furthermore, we conclude that County's reliance on the MOU and the mining cases of *El Dorado County, supra,* 122 Cal.App.4th 1591 and *City of Ukiah, supra,* 196 Cal.App.3d 47 was misplaced. We now explain our conclusions.

### A. *County's Responsibility as Lead Agency Under SMARA and CEQA*

■ The question of whether County had a responsibility to review Carlton's surface mining operations (and not merely the reclamation plan) must be considered in light of the requirements of SMARA and the local

ordinance adopted by County pursuant to SMARA. The Legislature declared that its intent in enacting SMARA was "to create and maintain an effective and comprehensive surface mining and reclamation policy with regulation of surface mining operations so as to assure that: [¶] (a) Adverse environmental effects are prevented or minimized and that mined lands are reclaimed to a usable condition which is readily adaptable for alternative land uses[; and ¶] (b) The production and conservation of minerals are encouraged, while giving consideration to values relating to recreation, watershed, wildlife, range and forage, and aesthetic enjoyment." (§ 2712, subds. (a) & (b).) "To achieve those goals, SMARA requires that persons conducting surface mining operations obtain a permit and obtain approval of a reclamation plan from a designated lead agency for areas subjected to post-January 1, 1976, mining. (§§ 2770, 2776.)" (*Hansen Brothers Enterprises, Inc. v. Board of Supervisors* (1996) 12 Cal.4th 533, 547 [48 Cal.Rptr.2d 778, 907 P.2d 1324], fn. omitted.) In particular, SMARA provides: "[N]o person shall conduct surface mining operations unless a permit is obtained from, a reclamation plan has been submitted to and approved by, and financial assurances for reclamation have been approved by, the lead agency for the operation pursuant to this article." (§ 2770, subd. (a).) This section, including the requirement that a surface mining permit be obtained from the lead agency, has been described as " '[a]t the heart of SMARA.' " (*People ex rel. Dept. of Conservation v. El Dorado County* (2005) 36 Cal.4th 971, 984 [32 Cal.Rptr.3d 109, 116 P.3d 567].)

To facilitate the enforcement of SMARA, section 2774 states that "[e]very lead agency shall adopt ordinances in accordance with state policy that establish procedures for the review and approval of reclamation plans and financial assurances and the issuance of a permit to conduct surface mining operations . . . ." (§ 2774, subd. (a).) In the present case, County adopted such an ordinance, entitled "SURFACE MINING OPERATIONS," which was enacted for the express purpose of regulating surface mining within County in a manner consistent with the requirements of SMARA. (County Zoning Ord., § 19.100.010.) The ordinance provides: "[N]o surface mining operations may be undertaken anywhere in unincorporated Kern County unless a surface mining permit and a reclamation plan has been submitted to and approved by the Planning Commission in accordance with the procedures set out in Sections 19.102.130 through 19.102.180 of this title." (County Zoning Ord., § 19.100.020.)

 Local public agencies, such as cities or counties, are given the responsibility to enforce SMARA.[9] "SMARA devolves principal regulatory responsibility over surface mining to local public agencies" (*Save Our Sunol, Inc. v. Mission Valley Rock Co.* (2004) 124 Cal.App.4th 276, 281 [21 Cal.Rptr.3d 171]), and thus the SMARA lead agency is "usually the city or

---

[9] This is true even when a project takes place on federal land. (See pt. III., *post.*)

county." (*Brunius v. Parrish* (2005) 132 Cal.App.4th 838, 852 [34 Cal.Rptr.3d 55] [" ' "SMARA provides for 'home rule,' with the local lead agency having primary responsibility." ' "].) At the relevant time period herein, section 2728, part of SMARA, defined the "[l]ead agency" as "the city, county . . . or the board which has the principal responsibility for approving a surface mining operation or reclamation plan pursuant to this chapter." (Former § 2728.)[10] In the present case, there is no question that County was the lead agency under SMARA, since County was the local agency responsible for approving the reclamation plan (at the very least) and was also designated as the local agency to implement SMARA within unincorporated areas of County pursuant to the above referenced ordinance.

■ Based on the above provisions, it is clear that County, as lead agency, was responsible under SMARA and the local ordinance to evaluate Carlton's entire proposal and to determine *both* whether to issue a permit[11] for mining operations and whether to approve the reclamation plan. (§§ 2770, subd. (a), 2774, subd. (a); County Zoning Ord., § 19.100.020.) That being the case, it was improper for County to sever the mining operations from the scope of its review under SMARA.[12]

■ The same result is obtained when we consider the issue in the larger framework of the environmental review required under CEQA, and in particular CEQA's conception of (1) lead agency responsibility and (2) the nature and scope of a project. CEQA defines a "[l]ead agency" as "the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." (§ 21067.) The first part of that definition is that the lead agency must be a public agency, which under CEQA means a *state* agency. (§ 21063; CEQA Guidelines, § 15379 [the term public agency "does not include agencies of the federal government"].) In view of County's responsibility regarding approval of the surface mining project under SMARA *and* the fact that a federal agency cannot be a CEQA lead agency (since it is not a state public agency), we conclude that County was the lead agency under CEQA. Moreover, even if other agencies also had responsibility for approvals, CEQA mandates there be only one lead agency that will be ultimately responsible

---

[10] In an amendment to section 2728 that took effect on January 1, 2007, the definition of a "lead agency" was shortened to the following: " 'Lead agency' means the city, county . . . or the board which has the principal responsibility for approving a reclamation plan pursuant to this chapter." (Stats. 2006, ch. 869, § 18.) The amended definition does not alter the conclusion that County is the lead agency.

[11] A permit is defined under SMARA as "any authorization from, or approval by, a lead agency, the absence of which would preclude surface mining operations." (§ 2732.5.)

[12] As we explain herein *post*, we distinguish the situation in which an owner of a preexisting and ongoing mining operation (with a vested right to mine) is seeking approval of a reclamation plan only.

for reviewing the project and preparing an EIR or negative declaration. (CEQA Guidelines, § 15050, subd. (a); *Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 905 [100 Cal.Rptr.2d 173].)[13] In this case, that was clearly County.

As lead agency, County's significant responsibilities under CEQA included conducting an initial study to evaluate the potential environmental effects of the proposed mining project and determining, in response to the information provided in the initial study, whether to prepare an EIR or adopt a negative declaration. (*El Dorado County, supra,* 122 Cal.App.4th at p. 1596; *Planning & Conservation League v. Department of Water Resources, supra,* 83 Cal.App.4th at p. 905; CEQA Guidelines, §§ 15004, 15063, 15367.) The initial study must include a description of the project (*City of Redlands, supra,* 96 Cal.App.4th at pp. 405–406), and "[t]he scope of the environmental review conducted for the initial study must include the *entire* project" (*Tuolumne County Citizens, supra,* 155 Cal.App.4th at p. 1222, italics added). "All phases of project planning, implementation, and operation must be considered in the initial study of the project." (CEQA Guidelines, § 15063, subd. (a)(1).) "Where an agency fails to provide an accurate project description, or fails to gather information and undertake an adequate environmental analysis in its initial study, a negative declaration is inappropriate. [Citation.] An accurate and complete project description is necessary to fully evaluate the project's potential environmental effects. [Citations.]" (*El Dorado County, supra,* at p. 1597.)

Because County, as lead agency, was required by CEQA to consider and evaluate the potential environmental effects of the entire project, we now discuss the definition of a *project* under CEQA and the consequences of that definition in the present context. As will be seen, CEQA's notion of what constitutes a project confirms that Carlton's proposed mining operations and reclamation plan together constituted a single project in this case. Accordingly, *both* had to be reviewed by County.

B. *The Scope of the Project as Defined by CEQA*

■ CEQA defines a "[p]roject" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and . . . [¶] . . . [¶] . . . that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (§ 21065.) The CEQA Guidelines augment the statutory definition by specifying that a

---

[13] So much importance is attached to the lead agency role, CEQA prohibits delegation of that role to another agency. (*Planning & Conservation League v. Department of Water Resources, supra,* 83 Cal.App.4th at p. 907.)

"[p]roject" means *"the whole of an action,* which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment" and which is undertaken, supported or approved by a public agency. (CEQA Guidelines, § 15378, subd. (a), italics added.)

As is readily apparent from the above definitions, CEQA's conception of a project is broad (see *Friends of the Sierra Railroad v. Tuolumne Park & Recreation Dist.* (2007) 147 Cal.App.4th 643, 653 [54 Cal.Rptr.3d 500]), and the term is broadly construed and applied in order to maximize protection of the environment (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 730 [32 Cal.Rptr.2d 704]). This big picture approach to the definition of a project (i.e., including " 'the whole of an action' ") prevents a proponent or a public agency from avoiding CEQA requirements by dividing a project into smaller components which, when considered separately, may not have a significant environmental effect. (*Tuolumne County Citizens, supra,* 155 Cal.App.4th at p. 1222; *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus, supra,* at p. 730.) That is, the broad scope of the term "project" prevents "the fallacy of division," which is the "overlooking [of a project's] cumulative impact by separately focusing on isolated parts of the whole." (*McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1144 [249 Cal.Rptr. 439].) Environmental considerations may not be submerged by chopping a single CEQA project into smaller parts for piecemeal assessment. (*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283–284 [118 Cal.Rptr. 249, 529 P.2d 1017].) Rather, *"the whole of an action"* or the entire activity for which the approvals are being sought must be considered by the agency. (CEQA Guidelines, § 15378, subds. (a) & (c), italics added.)

CEQA Guidelines further clarify that the term "project" refers to "the activity which is being approved and *which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval.*" (CEQA Guidelines, § 15378, subd. (c), italics added.) This important elaboration is meant to "ensure that a project proponent does not file separate environmental reports for the same project to different agencies thereby preventing 'consideration of the cumulative impact on the environment . . . .' [Citation.]" (*Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1190, fn. 5 [61 Cal.Rptr.2d 447], quoting *City of Santee v. County of San Diego* (1989) 214 Cal.App.3d 1438, 1452 [263 Cal.Rptr. 340].) It also serves as a reminder that there may be more than one agency issuing approvals for a particular project and clarifies that the project is not to be confused with each separate governmental approval.

Finally, we note that the question of the nature or scope of a project—what constitutes the " 'whole of an action' "—is an issue of law that appellate courts may decide based on undisputed facts in the record. (*Tuolumne County Citizens, supra,* 155 Cal.App.4th at p. 1224.)

Based on the foregoing, we conclude that the entire CEQA project that had to be reviewed by County included *both* the mining operations and the reclamation plan. Both aspects were integrally related and constituted the whole of the action or the entire activity for which approvals were being sought. Indeed, the reclamation plan was simply the final phase of the overall usage of the land proposed by Carlton, by means of which the land will be (or was intended to be) significantly restored. Also, the two aspects are closely related by the fact that a reclamation plan was legally required in any proposal to engage in surface mining operations in California (§ 2770, subd. (a)). For these reasons, the mining and reclamation activities proposed by Carlton constituted a single CEQA project. (See *Tuolumne County Citizens, supra*, 155 Cal.App.4th at pp. 1225–1231 [where distinct actions are closely related to same overall objective, or if success of the overall objective depends on the inclusion of certain action, the distinct actions are viewed as parts of a larger whole—the same project].) Therefore, in accordance with our discussion above, CEQA required County to engage in an environmental review of both the mining operations and the reclamation plan—the entire project.

Since County's analysis of potential environmental impacts in its initial study was limited to the reclamation plan and did not extend to Carlton's mining operations, County failed to review the *entire* project as required by CEQA and thereby abused its discretion. To put it another way, when County focused on the reclamation plan alone, it committed the "fallacy of division" whereby a larger, whole project was improperly divided into component parts for piecemeal consideration. That was error, and the error was clearly prejudicial because County decision makers and the public were thereby deprived of the essential information and environmental analysis that CEQA mandates. (See *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 166–167 [217 Cal.Rptr. 893] [prejudicial error found where the county divided a single shopping center project into two parts that received negative declarations, thereby preventing adequate assessment of cumulative impacts].)

"An accurate and complete project description is necessary for an intelligent evaluation of the potential environmental impacts of the agency's action." (*City of Redlands, supra*, 96 Cal.App.4th at p. 406, fn. omitted.) That did not occur in this case because County treated the reclamation plan as though it were an entirely separate project from the rest of the surface mining activity and operations proposed by Carlton. Accordingly, as more fully

explained in our disposition herein, County's adoption of the mitigated negative declaration and approval of the reclamation plan only must be set aside because of County's prejudicial failure to review the potential environmental impacts of the *entire* project. (See, e.g., *Tuolumne County Citizens, supra*, 155 Cal.App.4th at pp. 1231–1232 [negative declaration and entitlements set aside where initial study failed to consider entire project]; *Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1200 [31 Cal.Rptr.3d 901] [negative declaration set aside due to failure to consider whole project].)

C. *The Two Mining Cases Relied on by County and the Trial Court*

We briefly address the two mining cases that were relied on by County planning staff and by the trial court in its judgment below: namely, *El Dorado County, supra*, 122 Cal.App.4th 1591 and *City of Ukiah, supra*, 196 Cal.App.3d 47. As articulated in our discussion that follows, those cases are distinguishable because they involved preexisting (pre-SMARA) mining operations that continued to operate under long-standing, vested rights. Thus, the ongoing mining operations that were involved in those cases needed no governmental approval, but only—after SMARA became law in 1976— approval of a reclamation plan. To be more specific, SMARA provides that a person with a preexisting (i.e., a pre-Jan. 1, 1976) vested right to conduct surface mining operations is not required to secure a permit to continue such mining operations (§ 2776), but must submit a reclamation plan to the lead agency no later than March 31, 1988. (§ 2770, subd. (b).) That was precisely the situation in the *El Dorado County* and *City of Ukiah* cases, as we now explain.

We begin with the older of the two cases, *City of Ukiah.* In that case, Ford Gravel Company, Inc. (Ford), had conducted gravel excavation (a form of surface mining) at a location on the Russian River in Mendocino County since 1946. In the 1960's, after a local ordinance was passed requiring a use permit for " 'the establishment' " of such commercial mining activities, Ford proceeded to obtain the appropriate use permits for its operations. (*City of Ukiah, supra*, 196 Cal.App.3d at p. 56, italics omitted.) The permits that were granted had no conditions or expiration dates. (*Id.* at pp. 49–50.) In 1975, the Legislature enacted SMARA, which included the requirement that "no person shall conduct surface mining operations unless a permit is obtained from, a reclamation plan has been submitted to and approved by, . . . the lead agency for the operation . . . ." (§ 2770, subd. (a).) However, as emphasized by the Court of Appeal in *City of Ukiah*: "The permit requirement does not apply . . . to an operator 'who has obtained a vested right to conduct surface mining operations prior to January 1, 1976 . . . .' As to such operator, all that is necessary is a reclamation plan. (§ 2776.)" (*City of Ukiah, supra*, at p. 50.)

In 1983, in response to a citizen's complaint, the Mendocino County Planning Commission asked Ford to submit a reclamation plan. The company did so, along with a statement of its vested rights. (*City of Ukiah, supra*, 196 Cal.App.3d at p. 50.) For some unknown reason, the County's planning department treated the reclamation plan as an application for a use permit to authorize *gravel excavation*. It thus undertook an initial study under CEQA of such excavation activities and recommended imposition of a number of conditions on the "use permit" in order to mitigate the environmental effects of such gravel excavation. (*City of Ukiah, supra*, at p. 50.) The planning commission followed the recommendations, approved the mitigation requirements, adopted a mitigated negative declaration relating to gravel excavation, and granted the conditional use permit for such excavation. Citizens concerned about water impacts appealed the decision to the board of supervisors. The board of supervisors reviewed the matter more closely and concluded that no use permit was necessary for the excavation activities, nor did such activities need to be reviewed under CEQA, because Ford had a vested right to extract gravel. Thus, the board of supervisors concluded the only matter properly before it was the reclamation plan, which it proceeded to approve after adopting a negative declaration concerning the reclamation plan only. (*City of Ukiah, supra*, at pp. 50–51.) After a petition for writ of mandate challenging the board's actions was denied in the trial court, an appeal followed.

In the appeal in *City of Ukiah*, it was argued that "both the board and the trial court failed to consider the cumulative impact of Ford's gravel extraction activities in combination with other gravel mining operations on the river." (*City of Ukiah, supra*, 196 Cal.App.3d at p. 53.) The Court of Appeal rejected that argument as misplaced, explaining that "we do not think Ford can be compelled to obtain a use permit to continue its preexisting gravel mining operations." (*Id.* at p. 56.) The Court of Appeal further elaborated as follows: "Ford's underlying activity was, of course, its extraction of gravel from the Russian River. But that activity did not require a license, permit or other authorization in view of the . . . determination that Ford already possessed a vested right or authority to extract gravel. . . . Thus, the only matter presented for board approval was Ford's reclamation plan. Consequently, any environmental inquiry was limited to whether *that* project would have a significant environmental impact." (*Id.* at p. 54, citation & fn. omitted.)

A similar situation existed in the case of *El Dorado County, supra*, 122 Cal.App.4th 1591. In that case, a mining company known as Spreckels Limestone Products Company (Spreckels) owned and operated a limestone quarry near the American River, adjacent to Highway 49. The quarry was mined continuously from 1946 to the present and constituted "a legal, nonconforming use" as to which Spreckels had "a vested mining right." (*Id.* at p. 1595.) In the 1990's, Spreckels was updating its 1980 SMARA reclamation

plan and applied to the county for approval of its updated reclamation plan. The updated reclamation plan included the reclamation of an additional 16 acres located on adjacent federal land that Spreckels was considering leasing from the Bureau of Reclamation. After the planning commission approved the updated reclamation plan with a negative declaration, a petition for writ of mandate alleging CEQA violations was filed and was denied by the trial court.

On appeal, it was argued that the county failed to review the entire project, which the appellants defined as including both the mining operations and the updated reclamation plan. The Court of Appeal in *El Dorado County* disagreed. It held that the only project the county had to review under CEQA was the updated reclamation plan because (1) the existing mining operations were already "allowed as a vested mining right," and (2) the addition of 16 acres of reclamation was merely an adjunct of the updated reclamation plan itself, not a request for any additional mining activities. (*El Dorado County, supra,* 122 Cal.App.4th at p. 1598.) Moreover, the Court of Appeal stressed that any proposal by Spreckels to expand the mining operation onto the 16 acres would be subject to the appropriate environmental review process and such impacts would "have their day of review" at the appropriate future time.[14] (122 Cal.App.4th at pp. 1598–1599.)

In light of the unique factual setting in both of the above mining cases—the existence of pre-SMARA surface mining that was still being conducted under vested mining rights—we believe those cases are distinguishable from the one presently before us. Here, although Carlton's plan would utilize a previously mined area (the Monarch Calcite Quarry), there was no preexisting and ongoing surface mining operation by Carlton on the 40-acre site pursuant to vested rights. Instead, Carlton submitted what amounted to an entirely new mining and reclamation plan, and the whole project described therein could not proceed without first obtaining necessary governmental approvals. (§ 2770, subd. (a).) Thus, unlike the two mining cases discussed above, here both aspects of the proposed mining plans— mining operations and reclamation—were at once on the table and had to be reviewed and approved for the first time by the appropriate governmental agencies.[15] Moreover, as we have decided herein, that approval process had

---

[14] In the instant case, unlike the *El Dorado County* case, no further environmental review of the mining operation was going to take place after County approved Carlton's application relating to a reclamation plan only.

[15] As we noted earlier in our background factual summary, Carlton's applications were made to County and BLM for governmental approvals, both applications described the mining operations and the reclamation plan, were submitted within the same general time period in 2005 and were (briefly) pending concurrently.

to include County's environmental review of the entire project—both the mining operations and reclamation plan—as mandated by SMARA and CEQA.

In summary, even though BLM may have completed its environmental study and granted federal "approval" before County completed its own CEQA and SMARA state law proceedings, we do not believe the present case is analogous to a situation in which there was long-standing mining activity under vested mining rights. Rather, Carlton's surface mining and reclamation proposal constituted a new project concerning which environmental review by County of the whole of the action was necessary. For these reasons, we conclude that the *El Dorado County* and *City of Ukiah* cases are distinguishable.

### D. *The MOU*

■ Contrary to the conclusions of County planning staff and the trial court, the MOU did not authorize or require County to avoid environmental review of Carlton's mining operations.[16] We note preliminarily that the interpretation of a written instrument presents a question of law which is reviewed de novo, subject to certain exceptions not applicable here. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) When the language of a written contract is clear and explicit, it governs. (Civ. Code, § 1638; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].)

The MOU was a written agreement between the State of California, the Forest Service and BLM entered into in 1992 for the purpose of establishing procedures or guidelines to (a) coordinate environmental review, (b) facilitate compliance with state and federal environmental laws, and (c) avoid unnecessary duplication in situations where (as here) surface mining activities are proposed on federal land.[17] The MOU expressly acknowledges that cities or counties are the "lead agencies" that have the legal responsibility (within their jurisdictions) to regulate surface mining operations or reclamation plans under SMARA. At the same time, the provisions of the MOU reflect that

---

[16] Since the MOU did not do this, we need not resolve the question of whether such an agreement *could* permissibly do so without violating requirements of California law as set forth in SMARA and CEQA. Without deciding the issue, we note that we know of no legal basis for County to contractually abdicate its responsibilities under these statutes.

[17] The purposes of the MOU are stated therein as follows: "(1) [A]ssuring the application of adequate and appropriate reclamation throughout the State of California; (2) simplifying the administration of surface mining and reclamation practice requirements on Federal lands and on a combination of Federal and private lands; (3) achieving coordination of activity governing reclamation; and (4) eliminating duplication among the . . . agencies and counties serving as lead agencies ('lead agencies' pursuant to [SMARA]) in implementing State and Federal requirements."

proposals to operate a surface mine on federal land will require environmental documentation acceptable to, and a decision by, the Forest Service and/or BLM.[18] The MOU then specifies in its substantive provisions the manner of cooperation that is to be carried out between a lead agency and the Forest Service and/or BLM in such cases, so that the goals and legal responsibilities of each agency may be met without unnecessary duplication of effort.

For example, in its substantive provisions, the MOU requires lead agencies and the Forest Service and/or BLM to "work cooperatively" to ensure that conditions or measures required of mine operators to mitigate adverse environmental impacts "*conform to all applicable local, State*, and Federal regulations." (Italics added.) Further, while the MOU allows lead agencies to "accept as functionally equivalent documents" for purposes of SMARA, any reclamation plans, operational plans or environmental studies submitted pursuant to federal regulations, a lead agency may do so only if such plans and studies "meet or exceed lead agency requirements as included in the lead agency's State-certified surface mining and reclamation ordinance and any other applicable laws and regulations . . . ." Similarly, lead agencies may "accept as functionally equivalent, documents prepared under NEPA . . . that meet the requirements of CEQA." As these provisions make clear, the MOU does not seek to avoid state law requirements, but to uphold them. It provides for cooperation and allows lead agencies to accept environmental documents prepared by a federal agency pursuant to NEPA, but only to the extent such documents comply with SMARA and CEQA.

The MOU specifies in further detail the level of cooperation that should be pursued when a surface mining project is proposed on federal land. At paragraph 8, the MOU states: "For mining operations requiring a Plan of Operations for projects solely on Federal land, that are not exempt from SMARA, BLM and the Forest Service will provide lead agencies notice and the opportunity for early participation, consultation, and submission of information and recommendations for the development of environmental documents and reclamation plans." Paragraph 9 of the MOU indicates that after receipt of such notification, lead agencies should promptly provide comments or recommendations to the Forest Service and/or BLM "so that they may be considered and incorporated, as appropriate, as part of the environmental review and proposed Forest Service and/or BLM decision." Paragraph 10 provides that public hearings for compliance with SMARA and the local SMARA ordinance should be coordinated with the Forest Service and/or BLM. Nothing in the above provisions suggests that the lead agency is expected to desist from its responsibilities under SMARA and/or CEQA.

---

[18] It comes as no surprise that the federal government would want to maintain the right to approve mining operations on its own land. That federal approval, however, does not by itself absolve County of its obligations under SMARA and CEQA.

Rather, the terms of the MOU merely furnish procedural opportunities for cooperative effort and early involvement with a goal of (1) producing joint documents that would be acceptable under both the federal and lead agency standards, or (2) preparing federal environmental documents that would be compliant with state law requirements and thus adequate for the lead agency to adopt as functionally equivalent documents.[19]

We conclude the MOU is not reasonably susceptible to an interpretation that County was relieved of its responsibilities under SMARA and CEQA to perform an environmental review of the mining operations. Therefore, the MOU does not even arguably support County's decision to engage in an environmental review of the reclamation plan only. In addition, we note in passing that County apparently failed to avail itself of the cooperation provisions of the MOU. Nothing in the record reflects that County assisted in the preparation of the federal environmental documents or otherwise undertook to assess the contents of the federal environmental documents to decide whether they were compliant with SMARA and CEQA and therefore, potentially, a functional equivalent to what SMARA and CEQA would require.

III. *CEQA and NEPA* Both *Applied to the Project*

An assumption underlying the approach taken by County and the trial court was that BLM's federal review of the mining operations under NEPA somehow precluded or barred County from fully undertaking state law environmental review under CEQA. Contrary to that assumption, however, CEQA contemplates there will be projects in which both CEQA and NEPA apply and it specifically provides for such occasions by setting forth various means of cooperation while at the same time ensuring that CEQA's standards are satisfied. (See, e.g., §§ 21083.5–21083.7; CEQA Guidelines, §§ 15220–15229, 15063, subd. (a)(2), 15361.)

For example, a separate article of the CEQA Guidelines, which includes sections 15220 through 15229, specifically covers the subject of "PROJECTS ALSO SUBJECT TO [NEPA]." CEQA Guidelines, section 15220 unequivocally states: "*This article applies to projects that are subject to both CEQA and NEPA. NEPA applies to projects which are carried out, financed, or approved in whole or in part by federal agencies.* Accordingly, this article applies to projects which involve one or more state or local agencies and one or more federal agencies." (Italics added.) Thus, the CEQA Guidelines plainly contemplate overlapping state and federal jurisdiction in the sense that certain projects may be subject to *both* CEQA and NEPA and hence may involve review and approvals by both state or local *and* federal agencies.

---

[19] The MOU is in essence the same as the CEQA provisions that state how to proceed when both NEPA and CEQA apply to the same project, which provisions are discussed herein below.

When a project is subject to both CEQA and NEPA, state and local agencies are directed to cooperate with federal agencies "to the fullest extent possible to reduce duplication between [CEQA] and [NEPA]," and such cooperation should, if possible, include: "(a) Joint planning processes, [¶] (b) Joint environmental research and studies, [¶] (c) Joint public hearings, [and ¶] (d) Joint environmental documents." (CEQA Guidelines, § 15226.) The statutory provisions of CEQA expressly allow that an EIS (environmental impact statement), which is the NEPA counterpart to an EIR, may be used *in lieu of* an EIR *if* the EIS, or that part of the EIS that is used, "*complies with the requirements of this division and the guidelines adopted pursuant thereto.*" (§ 21083.5, subd. (a), italics added.) Further, CEQA Guidelines make specific provision for a lead agency to avoid duplication in cases where the project is subject to both CEQA and NEPA by either (1) preparing joint environmental documents with the federal agency (CEQA Guidelines, §§ 15222–15223), or (2) consulting with the federal agency with the goal that the environmental documents prepared by the federal agency (an EIS or FONSI) will be suitable for use by the lead agency *in lieu of* an EIR or negative declaration (CEQA Guidelines, §§ 15221, 15223). Section 15221 spells out the conditions for a lead agency to use the federal agency's NEPA environmental document (an EIS or FONSI) in lieu of an EIR or negative declaration; namely, the NEPA document "will be prepared before an EIR or negative declaration would otherwise be completed for the project," *and* the EIS or FONSI "*complies with the provisions of these guidelines.*" (CEQA Guidelines, § 15221, subd. (a)(1) & (2), italics added.) As the above provisions make clear, if a particular project comes under NEPA and will be reviewed by a federal agency, cooperation is required on the part of the state or local agencies—and in particular the lead agency—to attempt to minimize the duplication of effort, but that does not eliminate the responsibility of the lead agency to ensure compliance with CEQA. (CEQA Guidelines; § 21083.5, subd. (a).)[20]

Similarly, regarding notice and circulation requirements where the lead agency elects to rely on a federal agency's environmental document, the CEQA Guidelines provide as follows: "(a) Where the federal agency circulated the EIS or [FONSI] for public review as broadly as state or local law may require and gave notice meeting the standards in Section 15072(a) or 15087(a), the lead agency under CEQA may use the federal document in the place of an EIR or negative declaration without recirculating the federal document for public review. One review and comment period is enough. *Prior to using the federal document in this situation, the lead agency shall give notice that it will use the federal document in the place of an EIR or*

---

[20] CEQA Guidelines, section 15221, subdivision (b), adds: "Because NEPA does not require separate discussion of mitigation measures or growth inducing impacts, these points of analysis will need to be added, supplemented, or identified before the EIS can be used as an EIR."

*negative declaration and that it believes that the federal document meets the*
*requirements of CEQA.* The notice shall be given in the same manner as a
notice of the public availability of a draft EIR under Section 15087." (CEQA
Guidelines, § 15225, subd. (a), italics added.) As highlighted in the above
quote, the lead agency must give notice that it "believes that the federal
document meets the requirements of CEQA," which also means that it must
actually consider the federal document in order to decide that it believes it to
be CEQA-compliant.

To recapitulate, CEQA expressly recognizes there will be projects in which
both CEQA and NEPA apply. In such cases, CEQA provides means of
cooperation to avoid unnecessary duplication. However, the state or local
*lead* agency must still ensure that CEQA is fully complied with, including in
those instances where the environmental documents are jointly produced or
are produced by the federal agency and subsequently accepted by the state or
local lead agency in lieu of an EIR or negative declaration. We believe that
CEQA's approach to the issue of concurrent applicability of CEQA and
NEPA, as outlined herein, supports our conclusion in the present case that
when BLM completed its environmental review under NEPA and made its
findings, County was still required to comply with CEQA (and SMARA) with
respect to the entire project.

An analogous case decided by the United States Supreme Court is helpful
in understanding that a state agency may have authority to enforce state law
environmental regulations (such as CEQA) in regard to projects on federal
land. In *California Coastal Comm'n v. Granite Rock Co.* (1987) 480 U.S. 572
[94 L.Ed.2d 577, 107 S.Ct. 1419], Granite Rock applied for approval from
the Forest Service of a five-year plan for mining limestone on Forest Service
land. In 1981, the Forest Service prepared an environmental assessment of
the mining plan and, after requiring certain modifications, approved the plan.
Granite Rock then commenced its mining operations. In 1983, the California
Coastal Commission (Coastal Commission), seeking to apply the California
Coastal Act of 1976 (§ 30000 et seq.),[21] instructed Granite Rock that it must
obtain a permit from the Coastal Commission for its mining operation.
(*California Coastal Comm'n v. Granite Rock Co., supra,* at pp. 575–576.)
Granite Rock filed an action in the United States District Court to prevent the
Coastal Commission from enforcing the permit requirement on the ground
that it was *preempted* by Forest Service regulations and federal statute. The
district court found no federal law preemption, the court of appeals disagreed
and reversed, and the case was appealed to the United States Supreme Court.
(*Id.* at p. 577.)

---

[21] The California Coastal Act of 1976 provides for environmental regulation of projects in
certain coastal regions and is certified as a regulatory program that is in compliance with
CEQA. (See CEQA Guidelines, § 15251, subd. (c).)

 Since no actual conditions had yet been placed on Granite Rock to obtain a permit from the Coastal Commission, the issue before the Supreme Court was limited to a purely *facial* challenge of the state law permit requirement—i.e., whether or not *any* state law permit requirement was per se preempted. (*California Coastal Comm'n v. Granite Rock Co., supra*, 480 U.S. at p. 580.) In concluding that there was no preemption, the Supreme Court cited *Kleppe v. New Mexico* (1976) 426 U.S. 529, 543 [49 L.Ed.2d 34, 96 S.Ct. 2285], for the proposition that " 'the State is free to enforce its criminal and civil laws' on federal land so long as those laws do not conflict with federal law." (*California Coastal Comm'n v. Granite Rock Co., supra*, at p. 580.) The Supreme Court noted that while application of state law may be preempted either by (i) federal law occupying the entire field, or (ii) a conflict with federal law that makes it impossible to comply with both state and federal law, the federal government's environmental regulation of unpatented mining claims in national forests does not preempt state environmental regulations that are not in actual conflict. (*Id.* at pp. 581–583.) The Supreme Court found that the Forest Service regulations and other specified federal laws were not only devoid of any expression of intent to preempt state environmental law, but actually assumed that those submitting plans of operations would comply with such state environmental laws. (*Id.* at pp. 583, 587, 593.) Accordingly, the Supreme Court concluded that the state law permit requirement, as a means of imposing reasonable environmental regulation on mining operations (including mining on federal lands), was not in conflict with federal law and was not preempted on its face. (*Id.* at p. 593.)

Here, similarly, BLM's own regulations specifically provide for compliance with state environmental laws. (See, e.g., 43 C.F.R. §§ 2920.7(b)(4), 3802.3-2, 3809.3, 3591.1(c) (2010); see also 36 C.F.R. § 228.46 (2010).) Although no preemption claim was made in this case, and thus we do not reach that particular issue, we do make the following general observation: Based on the analysis set forth in *California Coastal Comm'n v. Granite Rock Co., supra*, 480 U.S. 572, there is nothing necessarily problematic (from a preemption standpoint) in the fact that County is called upon to apply CEQA and SMARA regarding a mining project on federal land, even if that project already received federal environmental review and "approval" by BLM under NEPA. And, as we have noted above, CEQA clearly contemplates that CEQA and NEPA may both apply to the same project, which was the case here. For all of these reasons, to the extent the trial court and County believed there was some kind of inherent jurisdictional bar to County meeting its CEQA and SMARA responsibilities to review the entire mining project, we disagree.[22]

---

[22] We reiterate that no conflict with any federal law has been argued or shown in this case.

IV. *An EIR Is Required*

Petitioners further argue that County must be ordered to prepare an EIR based on CEQA's fair argument test. "With certain limited exceptions, a public agency must prepare an EIR whenever substantial evidence supports a fair argument that a proposed project 'may have a significant effect on the environment.' [Citations.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502]; see *County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1579–1580 [27 Cal.Rptr.3d 28]; *Stanislaus Audubon Society, Inc. v. County of Stanislaus* (1995) 33 Cal.App.4th 144, 150–152 [39 Cal.Rptr.2d 54].) "[A] project 'may' have a significant effect on the environment if there is a 'reasonable possibility' that it will result in a significant impact. [Citation.]" (*County Sanitation Dist. No. 2 v. County of Kern, supra*, at p. 1581.)

"The determination by an appellate court under the fair argument test involves a question of law decided independent of any ruling by the superior court. [Citation.]" (*County Sanitation Dist. No. 2 v. County of Kern, supra*, 127 Cal.App.4th at p. 1579.) Thus, we independently review the record and determine whether there is substantial evidence in support of a fair argument that the proposed project may have a significant environmental impact, while giving the lead agency the benefit of a doubt on any legitimate, disputed issues of credibility. (*Ibid.*) The fair argument test is routinely described as "a low threshold requirement for the initial preparation of an EIR that reflects a preference for resolving doubts in favor of environmental review." (*Ibid.*)

We note some important definitions. First, the term "substantial evidence" is defined by the CEQA Guidelines to mean "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (CEQA Guidelines, § 15384, subd. (a).) Substantial evidence includes "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts," but does not include "[a]rgument, speculation, unsubstantiated opinion or narrative, [or] evidence which is clearly erroneous or inaccurate." (*Id.*, subds. (b), (a); see § 21080, subd. (e)(1) & (2).) Second, the term " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (§ 21068.) As elaborated in the CEQA Guidelines, a significant effect on the environment is "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project[,] including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance." (CEQA Guidelines, § 15382.)

Applying these principles, we conclude there was substantial evidence in the record to support a fair argument that the project may have significant effects on the environment. The primary and overriding basis for County's adoption of a negative declaration was its assumption that the project was limited to the reclamation plan only. But once that assumption is removed, as we have done, the situation is entirely different. When the *entire* project is considered, including the planned 30 years of surface mining operations, the record reveals sufficient information and inferences to indicate a fair argument that significant environmental impacts may exist.

We begin with the issue of potential impacts on air quality. County's Initial Study looked at the reclamation plan only and concluded that emissions or pollutants generated from reclamation activities would have less than a significant impact. A letter from Kern County Air Pollution Control District (the District), dated October 4, 2007, agreed with that conclusion based on its review of Carlton's study of air quality impacts of the reclamation plan, but the District emphasized it was not referring to the "full project" but only the reclamation plan. The District noted that it had received "an air quality impact analysis in September of 2007 from the project proponents for only the reclamation portion of the project. *The study does not address the cumulative impacts created by the full project*." (Italics added.) It is clear that County did not attempt to evaluate the air quality impacts of the entire mining project.

To appreciate the potential impact of the mining activity on air quality, a basic description of that activity is necessary. At the public hearing before the Board, Carlton's manager stated that calcite material from the surface mine would be hauled in 40-ton trucks to an undisclosed site near the mine, off a dirt road, where it would be partially processed (crushed to 1.5 inches in size), then loaded into smaller trucks[23] and transported across Highway 14 to Cantil for additional processing. He estimated there would be 40 truckloads of ore hauled every day—ten 40-ton trucks hauling four loads per day and returning after every load. Petitioners noted that if 250,000 cubic yards of material is mined per year, as is planned, the number of truck trips was underestimated by Carlton. Petitioners presented a simple mathematical formula that production of 250,000 cubic yards of material per year, with 25 tons per truck and an estimate of 1.8 tons per cubic yard, equates to 18,000 truckloads per year that would be traversing County roads.[24]

We believe that regardless of which estimate of total truck trips is more accurate, the bottom line is that there will be *extensive and daily* use of heavy-duty diesel trucks, at a rate of *at least* 40 truckloads per day, hauling

---

[23] Apparently, the smaller trucks had a 25-ton capacity.

[24] Although this calculation was disputed, it was never shown to be in error.

ore material from the mine to processing locations (then returning to the mine), all of which will be continuing daily over a 30-year period. Considering the substantial volume of diesel truck emissions that would necessarily be generated from this activity, which is a reasonable inference from the description provided, we conclude the facts are sufficient to create *a fair argument* that the project may have significant air quality impacts.[25] Hence, an EIR is necessary.

We also point out that there existed information supporting a fair argument that the project may result in significant impacts to the environment regarding issues of water resources and biology. County staff acknowledged that one of the dirt roads for truck access to the excavation site is "basically in the river bottom" or "creek bottom. . . . It washes out continuously." The California Regional Water Quality Control Board reviewed the site plan for the project and identified in an April 13, 2006, comment letter to County the existence of a channel that appeared to be "a blue line stream," and emphasized it was environmentally important that daily mining activity not be permitted to alter such a channel's course, or impact its water quality or habitat. Along the same lines, a January 5, 2006, comment letter regarding the project from California's Department of Fish and Game noted, among other things, the following potential impacts: "The proposed Project has the potential to substantially impact blue oak woodland, native and non-native grassland, intermittent streams, and the species dependent upon these resources. Wetland seeps may occur in the vicinity of limestone deposits and could be impacted by mining activities. The Project site is located within the known distribution range for the State-listed threatened Tehachapi slender salamander . . . . Traffic flow generated by the Project could result in take of the State and Federally-listed threatened desert tortoise . . . and the State-listed threatened Mohave ground squirrel due to vehicle strikes."

As this brief summary indicates, there *was* information before County from agencies with expertise in the areas described that the project could significantly impact water resources and plant and animal life in the area. County largely ignored this information (along with air quality impacts of mining operations) because it was convinced that it was only responsible to consider the impacts of the reclamation plan alone. We conclude from the information

---

[25] The use of the heavy trucks at a rate of 40 trips per day would also cause a significant impact (i.e., inordinate wear and tear) on County roads that are used by the trucks. Interestingly, on this point, County stepped in and sought to mitigate an impact of *the mining operations* by requiring Carlton to either (1) "provide a 0.20-foot asphalt concrete overlay on Jawbone Canyon Road from Highway 14 to a point at the end of the existing pavement approximately four miles to the west," or (2) contribute a specified amount of funds to the road resurfacing. On the record before us, we have insufficient information to decide whether this mitigation measure would likely reduce the impact on County roads to a level that would be less than significant.

described herein, and our review of the entire record, that the fair argument test is met and that an EIR should have been prepared regarding the entire project.

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court with directions to vacate its order denying the petition for writ of mandate and to enter a new order that grants the writ of mandate and directs County to (1) set aside the adoption of the mitigated negative declaration concerning the reclamation plan, (2) set aside the approval of the conditional use permit for the reclamation plan, (3) comply with SMARA by requiring a permit for Carlton's proposed surface mining operations as well as the approval of a reclamation plan and any other requirements of SMARA, (4) comply with CEQA by undertaking, prior to the issuance of any such permit or approval, environmental review of the entire project, including mining operations, by means of preparation and certification of a legally sufficient EIR regarding the entire project. Costs on appeal are awarded to petitioners.

Hill, Acting P. J., and Detjen, J., concurred.